# EXHIBIT A-20

VM

# ADDENDUM

NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12835

COMMONWEALTH vs. JEROME MORRIS.

Plymouth. November 7, 2022. - July 25, 2023.

Present: Budd, C.J., Gaziano, Cypher, Kafker, Wendlandt, & Georges, JJ.

Homicide. Firearms. Electronic Surveillance. Telephone. Constitutional Law, Admissions and confessions, Waiver of constitutional rights. Evidence, Admissions and confessions, Tape recording, Redirect examination. Practice, Criminal, Capital case, Motion to suppress, Admissions and confessions, Argument by prosecutor.

Indictments found and returned in the Superior Court Department on January 2, 2015.

A pretrial motion to suppress evidence was heard by Cornelius J. Moriarty, II, J., and the cases were tried before Gregg J. Pasquale, J.

Cathryn A. Neaves for the defendant.
Mary Nguyen, Assistant District Attorney, for the Commonwealth.

WENDLANDT, J. The defendant, Jerome Morris, was convicted of murder in the first degree on the theory of deliberate premeditation in connection with the August 2014 shooting of the

victim, Quentin Phillip.[1] Following a verbal altercation with the victim outside a bar in Brockton, the defendant walked away, retrieved a firearm from a friend, and converged on a vehicle in which the victim and his three friends were sitting. The victim was seated in the rear passenger's seat; the defendant took aim at the rear passenger's seat window and fired at least two shots at the window. One hit the victim in the chest, killing him. The defendant, who was caught on a video surveillance camera arguing with the victim and then retrieving a firearm just prior to the killing, admitted to discharging the firearm at the vehicle's window during a police station interrogation following his arrest and waiver of his Miranda rights; the surveillance camera footage and a recording of the interrogation were introduced at trial. The defendant argued at trial that the killing occurred in self-defense, contending that he believed the victim was armed.

On his direct appeal, the defendant contends that his statement at the police station should have been suppressed because police officers impermissibly recorded it without his express consent, in violation of G. L. c. 272, § 99 (wiretap statute). In addition, he maintains that the statement should

---

[1] The defendant also was convicted of unlawful possession of a firearm and unlawful discharge of a firearm within 500 feet of a building.

have been suppressed because he was not informed promptly of his right to make a telephone call and only was permitted a call after his interrogation, in violation of G. L. c. 276, § 33A. He further asserts that the prosecutor improperly referred to omissions in his statement to police officers. The defendant also asks the court to exercise its authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial. Finally, the defendant requests that we vacate his conviction of unlawful possession of a firearm in light of our recent opinion in Commonwealth v. Guardado, 491 Mass. 666 (2023). We affirm the convictions other than the unlawful possession conviction and discern no reason to grant relief under G. L. c. 278, § 33E.

1. Background. a. Facts. The following facts are supported by the evidence admitted at trial. Certain details are reserved for discussion of specific issues.

i. Surveillance footage and witness testimony. Shortly after 2:10 A.M. on August 9, 2014, the victim was fatally shot in the chest while seated in the rear passenger's seat of a vehicle that was exiting the parking lot of a Brockton bar.

Approximately twenty minutes prior to the killing, the victim and the defendant verbally argued outside the bar. During the confrontation, which lasted several minutes, the victim looked angry, but the defendant appeared calm. The

victim called the defendant a "bitch" in an aggravated tone. Surveillance footage of the argument captured the victim waving his arms and appearing to push the defendant.

The defendant and the victim separated; the victim went to a vehicle with his friends. The victim initially stood outside the vehicle, seemingly frustrated and angry. The victim then sat in the rear passenger's seat, talking to his friends, and making plans for where next to go. The vehicle doors were closed, and the windows, which were "very" tinted, were shut. The victim asked one friend to "pass [him] that"; the friend responded by telling the victim, "Chill." The victim said, "I don't trust these n*ggas," a phrase he repeated multiple times.

Meanwhile, the defendant retrieved an item, later determined to be a firearm, from one of his friends in the parking lot. With the firearm in hand, the defendant walked toward the vehicle in which the victim's group were sitting.

The victim's group, which had been waiting in the vehicle for another friend, soon learned that the friend would not join them; the defendant silently approached the rear passenger's window next to where the victim was sitting. The victim either was using his cell phone or was talking to the other passengers about their plans. The victim had his hand in his pocket. He

was not facing the window.[2] Upon noticing the defendant approaching, the victim said, "What's wrong with these dudes?" and one of the victim's friends either warned, "[Y]our people's coming to the door," or asked, "What does he want?" As the vehicle was slowly driven out of the parking lot, the defendant fired multiple gunshots into the rear passenger's side window; one bullet struck the victim in the chest.

The defendant fled. Surveillance footage shows the defendant handing the firearm to someone and continuing to run away.

Minutes later, the victim arrived at a hospital, where he was pronounced dead. The cause of death was a gunshot wound to the chest.

The victim was not seen with a firearm that night, no firearm was seen or found in the vehicle, and no gunshot residue was found on the victim's hands.

ii. Defendant's statement. The defendant was identified from the surveillance footage by the mother of one of his children. He was arrested, and after being given the Miranda warnings and waiving his rights, the defendant was interviewed at a police station. The interrogation was audio and video

[2] A medical examiner later testified that the victim was shot from the front, but at an angle, with the bullet entering the top of his right chest and exiting the bottom of his left chest.

recorded; a redacted copy of the recording was played for the jury. In the interrogation, the defendant admitted that he fired two shots at the vehicle window, behind which sat the victim.

The defendant explained that, prior to the shooting, he "went outside to talk with" the victim after the victim "called [him] outside." The victim asked the defendant if the two of them "had a problem"; the defendant responded that if they did, he "would've [already] did [sic] something to [the victim]." The victim called the defendant "soft" and a "bitch," and he stated that the defendant would not have done anything. At that moment, the defendant offered to fight the victim; but the victim refused, asserting that he did not want to ruin his night. The victim also said, "I'm a see you when I see you," "You already know what time it is with me," and "When I see you, it's on." The victim told the defendant that he "stays with it," which the defendant understood to mean that the victim had a firearm that night.

The defendant claimed that he was worried that something would happen to him -- that he would be "caught in the crossfire" -- and that he "just honestly thought about [his] kids." The defendant explained that the victim was "a shooter," unlikely to engage in hand-to-hand fighting; the defendant did

not want someone like that "on [his] back . . . [t]rying to shoot at [him] while [he's] with [his] family."

The defendant continued, asserting that he saw the victim behind a vehicle looking at him, "acting mad shifty," and "making motions . . . like he was about to do something" or "take cover." The defendant thought the victim was "acting kinda funny like he got somethin' or somethin'," as if "he had a weapon." The defendant claimed that he was going to leave, because he did not have a weapon and he thought that the victim did, but he was worried that the victim was waiting for him.

The defendant said that he had told his friends what had transpired with the victim; they asked him if he was going to "let that shit ride." Responding, he said he was not going to "try to run up on somebody [he felt] as though had a weapon on him." One of the defendant's friends offered the defendant a firearm, which he took, saying, "Let me see it. I'm gonna go see what's up." The defendant walked to the passenger's side of a vehicle and shot twice at the rear window, behind which sat the victim. The defendant then handed the firearm to someone and fled.

b. Procedural history. The defendant was indicted on one count of murder, in violation of G. L. c. 265, § 1; one count of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (a); and one count of unlawful discharge of a firearm

within 500 feet of a building, in violation of G. L. c. 269, § 12E. The defendant filed a motion to suppress his postarrest statement to investigators, which was denied after an evidentiary hearing.

At trial, the Commonwealth introduced a redacted recording of the defendant's interrogation. The jury found the defendant guilty of murder in the first degree on the theory of deliberate premeditation; the defendant was sentenced to life without parole.[3] The defendant timely appealed, and subsequently filed in this court a motion for a new trial, submitting arguments pursuant to Commonwealth v. Moffett, 383 Mass. 201, 208-209 (1981).[4]

2. Discussion. On appeal, the defendant raises several issues, as set forth supra. We address each in turn.

a. Motion to suppress statements made to investigators. The defendant argues that the motion judge erred in denying his

---

[3] The defendant also was found guilty of unlawful possession of a firearm and unlawful discharge of a firearm within 500 feet of a building. The defendant was sentenced to a term of from two and one-half years to two and one-half years and a day in State prison, concurrent with his life sentence, as to the former, and to a term of three months in the house of correction as to the latter, deemed served at the time of sentencing.

[4] See Moffett, 383 Mass. at 208 ("If appointed counsel, on grounds of professional ethics deems it absolutely necessary to dissociate himself or herself from purportedly frivolous points, counsel may so state in a preface to the brief," but still should "present the [points] succinctly in the brief").

motion to suppress his postarrest statements to investigators on two grounds, discussed infra. "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law" (citation and quotations omitted). Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).[5] We review video footage independently. See Commonwealth v. Yusuf, 488 Mass. 379, 380-381 (2021). And "[w]e review questions of statutory interpretation de novo." Conservation Comm'n of Norton v. Pesa, 488 Mass. 325, 331 (2021).

i. Recording under wiretap statute. The defendant argues that the recording of his police station statement, after police officers read to him, and he waived, his Miranda rights, was a "secret recording" prohibited by the wiretap statute.

---

[5] We supplement the motion judge's subsidiary findings with "evidence from the record that 'is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony.'" Jones-Pannell, 472 Mass. at 431, quoting Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). We do so "only so long as the supplemented facts 'do not detract from the judge's ultimate findings.'" Jones-Pannell, supra, quoting Commonwealth v. Jessup, 471 Mass. 121, 127-128 (2015).

Accordingly, he maintains that his motion to suppress the recording should have been allowed.[6]

A. Wiretap statute. The wiretap statute makes it a crime to "willfully commit[] an interception . . . of any . . . oral communication." G. L. c. 272, § 99 C 1. The term "interception" is defined as "to . . . secretly record . . . the contents of any . . . oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G. L. c. 272, § 99 B 4. A defendant whose oral communications have been intercepted in violation of the statute may bring a motion to suppress the contents of unlawfully intercepted communications and evidence derived therefrom. G. L. c. 272, § 99 P.

B. Motion judge's findings and video footage. The motion judge made the following findings of fact. The defendant was arrested at approximately 12:30 P.M. and taken to the Brockton police station and into an interview room, where an interrogation began at 1:11 P.M. The defendant was advised of

[6] The defendant also argues cursorily that the investigators failed to inform the defendant of the camera in order to "lull[ the defendant] into a false sense of security that they were having a 'cozy chat.'" The defendant cites nothing in the record to buttress this allegation, and the tenor of the interrogation, as reflected in the recording, does not support the defendant's claim of an illicit scheme.

his Miranda rights and his right to a prompt arraignment; he indicated that he understood his rights and signed written waivers of these rights. The interrogation, which was recorded by an audio-visual electronic recording device in the interrogation room, lasted a little longer than one hour.

The recording device did not look like a traditional camera; instead, its physical structure resembled a thermostat or motion sensor. The defendant was not notified that his statement was being recorded by electronic means. There was no sign indicating that there was a recording device in the interrogation room. The motion judge rejected the Commonwealth's suggestion that a small sign on the door between the garage and adjacent police station, which stated "Audio Monitoring on These Premises," was sufficient to notify the defendant that his interrogation was being recorded by electronic means.[7]

Although finding that the defendant did not receive actual or constructive notice of the electronic recording, the motion

---

[7] In discussing the defendant's Miranda waiver, the motion judge noted that the defendant "has extensive experience with the criminal justice system," having signed Miranda waivers on six prior occasions. Each of these occasions occurred after the court's decision in Commonwealth v. DiGiambattista, 442 Mass. 423, 447-448 (2004) (expressing "preference that [custodial interrogations] be recorded whenever practicable"). The officers knew of at least some of the defendant's prior criminal justice system history.

judge concluded that, because the defendant was advised that anything he said could and would be used against him in court, the recording was not surreptitious eavesdropping in violation of the wiretap statute.

In addition, the interrogation footage captured each officer taking written notes during portions of the interrogation. Before the defendant's admission that he twice shot at the victim, the defendant was prompted by one police officer: "This is where the people that listen to your story later on determine whether you really care about someone other than yourself, and you want to tell the truth and . . . be remorseful . . . and explain what you did and why you did it. That's where your role comes in now." A short while later, the officer added, "[I]f you're not gonna tell the truth, it's not gonna look good for you."

C. Recording of interrogation. The defendant's argument requires us to construe the wiretap statute and determine whether the statute criminalizes the electronic recording of a defendant's voluntary statement to police officers under circumstances where the defendant understands that the statement can and will be used against him and nonetheless decides to proceed with the interrogation, the defendant is informed that the interrogation presents an opportunity to relay his narrative for future listening, and the defendant understands that

officers are recording the statement (or parts thereof) in writing. This requires a legal determination, which we consider de novo, Pesa, 488 Mass. at 330-331; Jones-Pannell, 472 Mass. at 431, based on the factual findings by the motion judge.

Our opinion in Commonwealth v. Rainey, 491 Mass. 632 (2023), is instructive. There, unbeknownst to the person giving a statement to police officers (a victim of domestic violence), her voluntary statement was recorded by an electronic recording device -- a body-worn camera. Id. at 634. Nonetheless, the victim, like the defendant in this case, understood that her statement was being preserved; indeed, the victim, like the defendant here, spoke to the police officers for the purposes of memorializing her statement, and the video footage shows police officers taking written notes during portions of her statement. Id. at 635, 643-644. The defendant in Rainey, like the defendant here, nonetheless maintained that the recording was a "secret recording" in violation of the wiretap statute because the victim was unaware of the police officer's electronic recording device. Id. at 640.

We acknowledged in Rainey that "subsection 99 C of the wiretap statute could be construed literally as the defendant suggests" to criminalize the recording of the victim's voluntary statement. Id. at 642. However, given the absurdity of such a result, we declined to adopt such a construction because "in the

absence of more specific statutory language to that effect . . . , we [were] unwilling to attribute that intention to the Legislature." Id., quoting Commonwealth v. Gordon, 422 Mass. 816, 832-833 (1996). Rather, we concluded that the statute did not prohibit the admission of the recording in question because "nothing in the wiretap statute as a whole, including its codified preamble, evince[d] an intent to prohibit recording a victim's volunteered report of a crime where . . . the victim was aware that officers already were memorializing her report in writing." Rainey, supra at 643. Indeed, as we explained, the "legislative focus [of the wiretap statute, as set forth in the statute's preamble,] was on the protection of privacy rights and the deterrence of interference therewith by law enforcement officers' surreptitious eavesdropping as an investigative tool."[8] Id., quoting Gordon, supra at 833. See Gordon, supra

---

[8] "In pertinent part, the preamble of the wiretap statute codified the Legislature's finding that 'organized crime' existed in the Commonwealth and was 'a grave danger to the public welfare and safety.' G. L. c. 272, § 99 A. The Legislature concluded that '[n]ormal investigative procedures' were 'not effective in the investigation of illegal acts committed by organized crime' and that 'law enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized criminal activities.' Id. The preamble also codified the Legislature's recognition that 'the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the [C]ommonwealth.' Id." Rainey, 491 Mass. at 643 n.20.

(concluding, in view of legislative purpose of wiretap statute, that it does not prohibit recording of booking procedures in police station).[9] See also Rainey, supra at 642 (collecting cases turning to preamble to inform analysis of wiretap statute). The Legislature, we concluded, did not have in mind the type of voluntary statement given by the victim, much less to sanction criminally the conduct of police officers who preserved the victim's voluntary statement to them. Rainey, supra at 643-644.

Similarly, here nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize the police officers' recording of the defendant's voluntary statement, which the

[9] Our decision in Gordon did not rest, as the defendant suggests, on the ground that the electronic recording in that case "did not capture or reveal the defendants' thoughts or knowledge about some fact or subject." Gordon, 422 Mass. at 833. Indeed, it is pellucid that the wiretap statute does not use the content of the recording as a trigger for a violation. See G. L. c. 272, § 99 C 1 ("Proof of the installation of any intercepting device by any person under circumstances evincing an intent to commit an interception . . . shall be prima facie evidence of a violation . . ." [emphasis added]). Our reasoning in Gordon, as we explained in Rainey, centered on the Legislature's intent, as evinced in the wiretap statute's preamble, see note 8, supra, to prohibit surreptitious eavesdropping, see Rainey, 491 Mass. at 643, citing Gordon, supra at 832-833; because the Legislature did not appear to have in mind the recording of a booking procedure at the police station, we did not adopt the literal construction urged by the defendant, Gordon, supra at 832-833.

defendant understood was being preserved for future use in connection with the investigation of the crime about which the defendant was speaking voluntarily. The recording "was not used as an investigative tool to secretly eavesdrop on an otherwise private conversation";[10] rather, it captured the defendant's "voluntary statement to police officers, which [the defendant] knew was being memorialized by them in writing." Rainey, 491 Mass. at 643-644. Indeed, the officers explained to the defendant that the interrogation provided him an opportunity to tell his own story, and the defendant proceeded to do so knowing

---

[10] We agree with the defendant that the relevant question for purposes of the wiretap statute is not whether the defendant had a reasonable expectation of privacy. See Rainey, 491 Mass. at 644 n.21; Commonwealth v. Jackson, 370 Mass. 502, 506 (1976) ("we would render meaningless the Legislature's careful choice of words if we were to interpret 'secretly' as encompassing only those situations where an individual has a reasonable expectation of privacy"). Thus, our conclusion does not rest on a determination whether the defendant's rights under the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights were violated. See, e.g., Commonwealth v. DeJesus, 489 Mass. 292, 295 (2022) (defendant may challenge search or seizure under Fourth Amendment or art. 14 only if defendant has reasonable expectation of privacy). The wiretap statute evinces the Legislature's intent to provide broader protections than those provided by the State and Federal Constitutions. Accordingly, our analysis is guided by the Legislature's intent as set forth in the words of the statute, in the context of the statute as a whole. See Harvard Crimson, Inc. v. President & Fellows of Harvard College, 445 Mass. 745, 749 (2006) ("Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense").

that the statement would be preserved for later review. In particular, the defendant was warned that his statements could and would be used against him in a court of law and was reminded that individuals would "listen" to his statement. Presumably, he also saw the police officers, who were seated next to him, taking notes during his statement.[11] Regardless of whether the defendant recognized the electronic recording device as a thermostat, motion sensor, or camera, it strains credulity to conclude that the defendant did not understand that his statement was being memorialized. "The resulting video footage was not a clandestine recording precluded by the wiretap

---

[11] We do not, as the concurring justice suggests, ignore that the wiretap statute prohibits both secretly hearing and secretly recording. See G. L. c. 272, § 99 B 4 (defining "interception" as to "secretly hear" or "secretly record"). Our decision does not rest on the fact that the officers heard the defendant's statement. As in Rainey, we simply decline to attribute to the Legislature an intent to prohibit electronically recording a defendant's voluntary statement in circumstances where the defendant knows that his statement is being recorded by other means -- here, by use of a writing implement and paper. See Rainey, 491 Mass. at 644 n.22, quoting Commonwealth v. Moody, 466 Mass. 196, 209 (2013) ("'record' as used in the wiretap statute should be given its plain and ordinary meaning to 'mean, "to set down in writing" or "to cause [sound, visual images] to be transferred to and registered on something by electronic means in such a way that the thing so transferred and registered can . . . be subsequently reproduced"'"). See Moody, supra ("secretly record" as used in wiretap statute "includes the interception of text messages by viewing and transcribing them for use at a later date" [emphasis added]). A reading requiring suppression under the circumstances is without any foundation in the Legislature's intent, as expressed in the codified preamble.

statute; rather, it merely preserved the statement (albeit through an alternative, electronic medium) that the [defendant] voluntarily gave to law enforcement officers and which []he understood was being recorded by them by means of paper and pen." Id. at 644. See Commonwealth v. Ashley, 82 Mass. App. Ct. 748, 762 (2012), cert. denied, 571 U.S. 838 (2013) (wiretap statute did not criminalize use of camera in police station interrogation room to record defendant's volunteered statement to officers when officers "repeatedly expressed their intention to get it 'down on paper' and memorialize the interview"). Accord Commonwealth v. Hyde, 434 Mass. 594, 602 & n.9 (2001) (contrasting "clandestine recording" prohibited by wiretap statute with "good practice" of electronic recording of police interrogations based on presumption "that, when police interrogations are electronically recorded, the suspect is aware that the interrogation is being preserved").

ii. Denial of right to telephone call. The defendant next maintains that his statement should have been suppressed because he was denied his right to make a telephone call in violation of G. L. c. 276, § 33A. Section 33A provides:

> "The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be

> informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter (emphasis added)."

Although the statute does not set forth a statutory remedy for a violation of the defendant's right, we have applied the exclusionary rule to evidence gathered as a result of a violation of the statute where the defendant can show that the violation was intentional. See Commonwealth v. Walker, 466 Mass. 268, 278 (2013); Commonwealth v. Alicea, 428 Mass. 711, 716 (1999); Commonwealth v. Jones, 362 Mass. 497, 502 (1972).

A. Motion judge's findings. The motion judge made the following findings of fact. After the defendant, at the Brockton police station, waived his Miranda and prompt arraignment rights, at 1:13 P.M., the defendant was advised that he would be afforded a telephone call when he was taken to booking; but the defendant was not told when he would be taken to booking. More than one hour later, toward the end of the interrogation, an officer asked the defendant if he wanted to call his parents; the defendant responded that he would like to call his children and the mothers of his children, but "not right [then]." The defendant soon thereafter was taken to booking and advised of his right to make a telephone call.

The defendant had prior experience with the criminal justice system. In particular, on ten prior occasions, after

being arrested and booked at the Brockton police station, the defendant had been informed of, and utilized, his right to make a telephone call.

The motion judge concluded that G. L. c. 276, § 33A, was violated because the defendant neither was advised of his right to make a telephone call upon his arrival at the police station nor afforded the right to use a telephone within one hour of his arrival. The motion judge found that the violation, however, was unintentional, relying on the testimony of the police officers, corroborated by the video footage, that they promptly informed the defendant of his Miranda and arraignment rights. The motion judge also relied on the defendant's "prior experience with the criminal justice system," specifically his prior bookings.[12] Accordingly, the motion judge denied the defendant's motion to suppress.

B. Unintentional violation of telephone call right. The defendant contends that the motion judge's finding that the violation of G. L. c. 276, § 33A, was unintentional was erroneous. We review the finding of the motion judge, who directly heard the testimony of the arresting officers, for clear error. Jones-Pannell, 472 Mass. at 431. See Ashley, 82

---

[12] The motion judge made no finding as to whether the officers knew of this criminal history, outside of the defendant's outstanding probation arrest warrant.

Mass. App. Ct. at 759 (reviewing judge's rejection of intentional motive for clear error). In support of this argument, the defendant points to the evidence that one of the police officers told the defendant that he would have the "opportunity" to make a telephone call later but did not, at that time, inform him of his "right" to make a telephone call. He maintains that the statutory violation, in conjunction with the electronic recording of his statement, constituted an intentional plan to extract a confession. The defendant also contends that the motion judge erred in relying on his prior arrest history, including his prior exercise of his statutory right to make a telephone call; this history, the defendant asserts, has no bearing on the question whether the officers intentionally violated the statute.

We have concluded previously that a finding that a violation of § 33A was unintentional may be supported by evidence that officers informed a defendant of other rights. See, e.g., Walker, 466 Mass. at 278-279 ("The judge's reliance on the fact that the [officers] informed the defendant of . . . other rights is not misplaced, nor was the judge's consideration of the defendant's prior experience in the criminal justice system"). We also have concluded that, where the defendant previously has been informed of his right to a telephone call because, inter alia, the defendant has "prior experience in the

criminal justice system," the motion judge's consideration of the prior experience in determining whether to impose the exclusionary remedy is apt. See id. See also Commonwealth v. Leahy, 445 Mass. 481, 490 (2005) (where defendant "told the investigating officer that he knew his rights and had been arrested before" and defendant previously was seated across from large poster explaining telephone rights, "it was reasonable for the officer to assume that [the defendant] was well aware of his right to make a telephone call").

The defendant points to nothing in the record to support his contention that the violation was intentional, let alone that it was part of an illicit scheme.[13] Contrast Jones, 362 Mass. at 500 (applying exclusionary rule to preclude admission of defendant's statement where defendant was not allowed to make telephone call despite repeatedly asking for opportunity). A detainee's rights under § 33A are important. See, e.g., Commonwealth v. Bradshaw, 385 Mass. 244, 266 (1982), and cases cited. However, without more than the fact of the violation itself, the defendant has not carried his burden to show that

---

[13] The defendant's additional reliance on the electronic recording of his statement is misplaced. As discussed supra, the record shows the defendant was given Miranda warnings, waived them, and understood that his voluntary statement was being preserved.

the motion judge clearly erred in finding that the officers' conduct was not intentional.

b. Prosecutor's comments on defendant's omissions. During the redirect examination of one of the police officers who had conducted the defendant's interrogation, the prosecutor asked, "During [the defendant's] lengthy interview with you, did the defendant ever say he saw a gun in the car that night?" The investigator answered that he had not. Then, during her closing statement, the prosecutor referenced this testimony, stating:

> "At that point in time [the victim] doesn't point a gun at him, doesn't shoot at him, doesn't threaten him, nothing; and you know that because the defendant says none of that in his statement. He has the opportunity there in the statement to tell everything."
>
> "The police practically beg him, tell us everything you can to help you. Tell us every detail. They even at the end say, you know, we're going to go do booking but if you think of anything, we can come back. Tell us everything. He never says that [the victim] pointed a gun at him or threatened him or that he saw a gun." (Emphases added.)[14]

[14] During the interrogation, the defendant did not say that he saw the victim with a gun, but he did say that the victim "was a shooter," was "making motions," and was "acting kinda funny like he got somethin' or somethin' . . . actin' like he had a weapon." Toward the end of the interrogation, one of the investigators stated, "Tell me what we don't know. Tell me what we didn't ask you that we should've asked you." The investigator asked multiple times whether there was anything the defendant wanted to "add or subtract" to his story or otherwise change, then or after booking. It is a reasonable inference that, if the defendant had seen the victim with a firearm, he would have said so, rather than limiting his account to these statements. See Commonwealth v. Doughty, 491 Mass. 788, 799 (2023), quoting Commonwealth v. Joyner, 467 Mass. 176, 189

The defendant contends that these statements violated his privilege against self-incrimination, protected by the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. The Commonwealth maintains that, because the defendant waived his Miranda rights and decided to proceed with the interrogation, it was not improper for the prosecutor to identify inconsistencies between omissions during the post-Miranda interview and the trial defense.[15] The defendant did not object to either the direct examination testimony of the officer or the closing statement; accordingly, we review to determine whether either was improper and, if so, whether it created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Alemany, 488 Mass. 499, 511 (2021).

"'A defendant's silence after the police have given the warnings mandated by Miranda v. Arizona, 384 U.S. 436, 467-479 (1966), may not be used against the defendant' to impeach an

---

(2014) ("a prosecutor may argue reasonable inferences from the evidence").

[15] In opening, the defense counsel contended that, based on certain facts to be introduced in evidence, such as the victim asking a friend to hand him something, the jury should ask, "Was there a gun in the car?" And in closing, the defense counsel argued that the police investigation was "a very shoddy way to look for evidence of a gun in that car," and again focused on the victim asking his friend to pass him something and putting his hand in his pocket, inferring that the victim had a gun.

exculpatory explanation subsequently offered at trial." Commonwealth v. Guy, 441 Mass. 96, 103 (2004), quoting Commonwealth v. Waite, 422 Mass. 792, 797 (1996). See Doyle v. Ohio, 426 U.S. 610, 619 (1976) ("the use for impeachment purposes of [defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause"). However, where a defendant voluntarily chooses to speak to police officers and waives his Miranda rights, "[w]hat the defendant thereafter [chooses] to say or not say to each officer on the subject [can] properly be commented on by the prosecutor to expose inconsistencies." Guy, supra at 104. "A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to." Id. at 104-105, quoting United States v. Goldman, 563 F.2d 501, 503 (1st Cir. 1977), cert. denied, 434 U.S. 1067 (1978). Cf. Commonwealth v. Belton, 352 Mass. 263, 270, cert. denied, 389 U.S. 872 (1967) ("The remark complained of was not in effect directed at the defendant's silence while under arrest but rather at an inconsistency in his alibi which had been brought out during the trial").

The defendant does not now dispute that he voluntarily waived his Miranda rights.[16] Accordingly, the prosecutor permissibly commented on the inconsistency between the defendant's position at trial that the victim had a firearm and that the defendant acted in self-defense, on the one hand, and his statement to the interrogating police officers that he believed the victim was armed based only on his knowledge of the victim and the victim's movements prior to the shooting, on the other.

The defendant misapprehends our decision in Commonwealth v. Haas, 373 Mass. 545, 559 (1977), S.C., 398 Mass. 806 (1986). There, we held that the defendant's failure to volunteer that he was innocent could not be used against him to imply tacit admission of guilt. Id. at 559-560. We have distinguished "asking the jury to infer guilt from the fact that a defendant had not spontaneously volunteered his innocence during an interrogation" from commenting on omissions in the defendant's statement to officers. See, e.g., Commonwealth v. Thompson, 431 Mass. 108, 118, cert. denied, 531 U.S. 864 (2000), citing Haas,

---

[16] The defendant pressed this argument below, but has dropped it on appeal, and for good reason. His primary challenge to the validity of the Miranda waiver was that he was only advised that he was under arrest on his probation warrant, but the motion judge found that he was informed that he was under arrest for murder as well, and there is nothing in the record to suggest that the finding was clearly erroneous.

supra at 558-559 ("proper for the prosecutor to comment on the fact that the defendant did not ask appropriate questions" about what had happened to victim, his wife, during "far-ranging statement"). A prosecutor may comment on "the fact that the defendant did not inform the police at any time of certain important details of [his story] which was presented at trial," where the defendant told some details to the police. Belton, 352 Mass. at 270.[17] "The defendant had a constitutional right to silence, not a right to tell a story and then avoid explaining crucial omissions by stating they were an exercise of the right

---

[17] Nor are we persuaded that the reasoning of Commonwealth v. Rivera, 62 Mass. App. Ct. 859, 862 (2005), cited by the defendant, suggests a different holding. See id. ("The defendant certainly was under no burden spontaneously to volunteer potentially exculpatory information in his statement to police"). There, the prosecutor commented on the defendant's failure to mention during his interrogation that there were witnesses to the event; not mentioning witnesses during the interrogation was not inconsistent with presenting witnesses at trial. Id. By contrast, here, the defendant specifically told officers that he believed that the victim was armed based on the victim's prior statements and his movements in the car; he did not mention, as a basis for his belief that the victim was armed, that he actually saw that the victim carrying a firearm. At trial, the defendant's position was that one of the reasons he thought the victim was armed was that the victim actually had a firearm. The prosecutor's comment on the inconsistency was fair. See Commonwealth v. Lodge, 89 Mass. App. Ct. 415, 419 (2016) ("Contrary to the defendant's claim, because the defendant waived his right to remain silent, and made a voluntary statement about the [issue], the concerns outlined in [Haas] do not apply here").

to silence." Commonwealth v. Sosa, 79 Mass. App. Ct. 106, 113 (2011).

c. Review under G. L. c. 278, § 33E. After a review of the entire record, we discern no error warranting relief under G. L. c. 278, § 33E.[18]

3. Conclusion. We affirm the defendant's convictions of murder in the first degree and unlawful discharge of a firearm within 500 feet of a building. We vacate and set aside the defendant's conviction of unlawful possession of a firearm.[19] The defendant's motion for a new trial is denied.

So ordered.

---

[18] We have considered the additional arguments in the defendant's brief filed pursuant to Moffett, 382 Mass. at 207-208, and we conclude that they do not warrant granting his motion for a new trial.

[19] "[T]he defendant's rights under the Second Amendment [to the United States Constitution] and his rights to due process were violated when he was convicted of unlawfully possessing [a firearm] although the jury were not instructed that licensure is an essential element of the crime." Guardado, 491 Mass. at 693. "[O]ur holding [in Guardado] applies prospectively and to those cases that were active or pending on direct review as of the date of the issuance of [New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022)]." Guardado, supra at 694. As to whether retrial shall be permitted, that issue is currently pending before the court and is scheduled for oral argument in September 2023. See Commonwealth vs. Guardado, No. SJC-13315. The rescript in this opinion shall be stayed pending our decision in that case.

BUDD, C.J. (concurring). I agree that the motion judge was correct to deny the defendant's motion to suppress and that the defendant's convictions should be affirmed. I write separately because, in my view, the plain and unambiguous language of the wiretap statute, G. L. c. 272, § 99 B 4 (§ 99), should apply even where police officers adhere to other legal requirements, such as providing a Miranda warning. Applying the plain statutory language in this case, I conclude that the officers violated § 99. Nevertheless, because the officers did not deliberately record the defendant without his knowledge during his confession, his statements need not be suppressed.

1. Interpretation. Subject to limited, enumerated exceptions,[1] § 99 proscribes the secret recording of "the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given

[1] In summary, the act contains exceptions for (1) employees or agents of common carriers, (2) persons possessing or using an intercommunication system in the ordinary course of their business, (3) United States investigative and law enforcement officers acting pursuant to the laws of the United States and within the scope of their authority, (4) any person authorized by warrant to make interceptions, (5) investigative or law enforcement officers acting to ensure the safety of another officer or agent who is undercover or serving as a witness for the Commonwealth, (6) financial institutions communicating with their corporate or institutional trading partners in the ordinary course of business, and (7) law enforcement officers investigating certain offenses in connection with organized crime. See G. L. c. 272, § 99 B 4 & 7, D. Neither the Commonwealth nor the court asserts that any of the statute's exceptions apply in this case.

prior authority by all parties to such communication" (emphasis added). G. L. c. 272, § 99 B 4. See Commonwealth v. Jackson, 370 Mass. 502, 503 n.1 (1976), S.C., 391 Mass. 749 (1984). If none of the enumerated exceptions applies, "any person" includes law enforcement. See Commonwealth v. Burgos, 470 Mass. 133, 140 (2014) (noting that law enforcement may record with only one-party consent when investigating certain designated offenses in connection with organized crime). "Intercepting device" is defined as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." G. L. c. 272, § 99 B 3. As we observed in Curtatone v. Barstool Sports, Inc., 487 Mass. 655, 658 (2021), the statute does not define "secretly." We therefore adopt its plain language meaning, which includes "something kept hidden or unexplained." Id., quoting Merriam-Webster's Collegiate Dictionary 1122 (11th ed. 2020).

With the all-party consent provision and the act's applicability to "any person," including law enforcement officials unless authorized, the Legislature has placed tight controls on secretly recording oral communications. Accordingly, this court has both consistently underscored the act's broad prohibition against secretly recording conversations except as authorized by the statute and maintained that the relevant inquiry under § 99 is whether individuals being

recorded "have actual [or constructive] knowledge of the recording," which may be "proved where there are clear and unequivocal objective manifestations of knowledge" in the speakers' statements or conduct. Jackson, 370 Mass. at 507. See, e.g., Curtatone, 487 Mass. at 657-658; Commonwealth v. Moody, 466 Mass. 196, 208-209 (2013) (noting broad definition of "interception" under § 99); Commonwealth v. Tavares, 459 Mass. 289, 297 (2011) ("clear legislative intent" to limit availability of wiretapping in criminal investigations); id., quoting Commonwealth v. Thorpe, 384 Mass. 271, 279 (1981), cert. denied, 454 U.S. 1147 (1982) ("we have stated that the one-party consent exception is 'a narrow exception to the broad statutory prohibition against warrantless surveillance'"). See also Tavares, supra, quoting Thorpe, supra ("Legislature proceeded on the premise that electronic surveillance is anathema except within certain narrowly prescribed boundaries"). It is undisputed that the defendant did not have actual or constructive knowledge that he was being recorded. Given the language of the statute, and our prior precedent interpreting it, this finding is sufficient to conclude that an interception was made.

As a practical matter, a textual application of the statute in this case simply would mean that an individual being questioned by police must be given actual or constructive notice

that he or she is being audio recorded (even where the individual is aware that officers are taking notes and officers have provided a Miranda warning). See Commonwealth v. Hyde, 434 Mass. 594, 605 (2001) (no violation of § 99 occurs when recording is done in plain view even if actual notice is not given).[2] As this result is not illogical, we need not attribute intent to the Legislature where the statutory language speaks for itself. See Worcester v. College Hill Props., LLC, 465 Mass. 134, 138 (2013) (where statutory language is clear and unambiguous, it is conclusive as to legislative intent and should be enforced unless application would lead to absurd result); Commissioner of Correction v. Superior Court Dep't of the Trial Court for the County of Worcester, 446 Mass. 123, 124 (2006) (where statutory language is clear and unambiguous, our

---

[2] The United States Court of Appeals for the First Circuit has held that the application of the act to prohibit secret recording of police in carrying out their public duties violates the First Amendment to the United States Constitution. See Project Veritas Action Fund v. Rollins, 982 F.3d 813, 833-840 (1st Cir. 2020), cert. denied, 142 S. Ct. 560 (2021) (Project Veritas). However, this conclusion was specific to the context of civilians recording police officers in the performance of their public duties. See id. at 831, quoting Glik v. Cunniffe, 655 F.3d 78, 85 (1st Cir. 2011) (citation omitted) ("the [F]ederal constitutional guarantee of freedom of speech protects the right to record 'government officials, including law enforcement officers, in the discharge of their duties in a public space,' even when the recording, which there involved both audio and video, is undertaken without the consent of the person recorded"). See also Project Veritas, supra at 836-840. The analysis in Project Veritas does not apply here, where the subject of the secret recording is not a government official.

inquiry ends). In fact, advising suspects that their interview is being recorded is standard practice. See Commonwealth v. Alleyne, 474 Mass. 771, 785 (2016) (citing § 99 B 4, C 1, in clarifying that "[p]ermission to record an interview is not required so long as the interviewee has actual knowledge of the recording"); Commonwealth v. DiGiambattista, 442 Mass. 423, 445 (2004) (citing § 99 in noting suspect may refuse to allow recording).[3]

Nor does Commonwealth v. Gordon, 422 Mass. 816 (1996), counsel us to go beyond the text in this case. In Gordon, we held that the videotaping of the defendants' booking at a police station did not violate § 99, even though the defendants had no knowledge of the taping. Id. at 832. In reaching that conclusion, we alluded to the act's "legislative focus . . . on the protection of privacy rights and the deterrence of interference therewith by law enforcement officers' surreptitious eavesdropping as an investigative tool." Id. at 833. With that context in mind, we decided that the Legislature did not intend the act to apply to the recording of an administrative booking, where the "videotape did not capture or reveal the defendants' thoughts or knowledge about some fact or

[3] Indeed, an officer in this case testified that it is good practice for the police to inform those being interviewed that they are being recorded.

subject, but at best served only to exhibit the defendants' bearing and manner of speaking which were relevant on the question of their intoxication or sobriety at the time of the assaults" in question. Id. But Gordon readily is distinguishable from the present case because, here, the defendant's interrogation, not his booking, was recorded, and the recording plainly did capture the defendant's thoughts or knowledge about a fact or subject, namely, his actions, state of mind, and other circumstances during the night of the murder. Moreover, neither Gordon nor any of the cases decided since suggests that we intended to overrule Jackson. Instead, our decisions have continued to follow Jackson in focusing on whether a speaker has knowledge of the recording as the standard for determining whether a recording has been made "secretly" in violation of the act. See, e.g., Curtatone, 487 Mass. at 659 (defendant did not secretly record telephone call in violation of act, where plaintiff knew that he was being recorded); Commonwealth v. Boyarsky, 452 Mass. 700, 705-706 (2008) (recording that is made with actual knowledge of all parties is not "an interception" under § 99); Hyde, 434 Mass. at 600-601 (where no exceptions apply, recording made without knowledge or consent of all parties violates act even if no reasonable expectation of privacy).

2. Contemporaneous note-taking. For its part, the Commonwealth argues, and the court agrees, that because the defendant was aware that the officers were taking notes on his statement, and that his words could be used against him in court, the recording of the defendant's interview does not amount to the kind of "surreptitious eavesdropping" prohibited by § 99. However, nowhere does the statute state, or even imply, that memorializing speech through a nonintercepting method, such as pen and paper, creates latitude to contravene the statute's prohibition on memorializing speech through the use of an intercepting device without notice.

The statute broadly defines "intercept" as to "secretly hear" or "secretly record." G. L. c. 272, § 99 B 4. There is no doubt that the defendant was aware that he was being heard by the officers who were present and that his words were being memorialized through pen and paper. However, it also is uncontested that the defendant neither was informed nor otherwise made aware that he was being recorded. To determine that there is no "interception" where the "hearing" is not secret, but the recording is, ignores the phrase "to record" included in the definition of "interception." See Commonwealth v. Daley, 463 Mass. 620, 623 (2012) ("In statutory interpretation, '[n]one of the words of a statute is to be regarded as superfluous'" [citation omitted]). Thus, the

statute apparently contemplates circumstances in which one openly hears a conversation and secretly records it through the use of an intercepting device. Such conduct is a violation of the statute based on its plain language.

Although strict, the Legislature passed one of the most stringent wiretap statutes in the nation by design. See Hyde, 434 Mass. at 599 n.5 (discussing other States' wiretap laws); Jackson, 370 Mass. at 506 & n.6. The preamble evinces this strictness by highlighting two concerns of the Legislature's that it attempted to balance in enacting the wiretap statute: (1) law enforcement's ability to use "modern methods of electronic surveillance, under strict judicial supervision," to investigate organized crime and (2) protecting "the privacy of all citizens of the commonwealth." G. L. c. 272, § 99 A; Commonwealth v. Ennis, 439 Mass. 64, 68 (2003).

To effectuate this balance, the statute details the very limited circumstances in which law enforcement may record a member of the public without his or her knowledge or consent. See Hyde, 434 Mass. at 599 ("The commission clearly designed the 1968 amendments to create a more restrictive electronic surveillance statute than comparable statutes in other States"). Again, neither the Commonwealth nor the court contend that any of these circumstances are present in this case. Bearing in mind the broad coverage of § 99 and the narrowness of its

exceptions for law enforcement activities, we should not infer that the Legislature intended to exempt police officers from informing a member of the public that they are being recorded so long as the officers adhere to other, unrelated legal directives.

In accordance with our prior precedent, in determining whether the recording of the defendant's interrogation in this case was made "secretly" in violation of § 99, we should focus on whether the defendant knew that his interrogation was being recorded. The motion judge's findings that the defendant was not advised and did not have constructive notice of the recording have not been challenged. Thus, absent evidence of clear error, these findings conclusively should establish that the recording was made in violation of the statute.

3. Remedy. Although I conclude the interview was intercepted, as the term is defined in § 99, the statute "does not . . . require the suppression of all communications intercepted in violation of its provisions." Commonwealth v. Santoro, 406 Mass. 421, 423 (1990). As "[t]he Legislature has left it to the courts to decide whether unlawfully intercepted communications must be suppressed," id., I would affirm the motion judge's decision to deny the defendant's motion to suppress, as the court does today.

Exclusionary rules "are intended to deter future police conduct in violation of constitutional or statutory rights." Id. As such, this court has had occasion to affirm the denial of a motion to suppress recordings made in violation of the act where no deterrent purpose would be served by requiring suppression. See id. As one of the officers testified at trial, it was standard practice to inform those being interviewed that they were being recorded, and he had done so with another witness whom he had interviewed in the case.

Moreover, as the court notes, the motion judge found that the officers promptly had reviewed the defendant's Miranda and arraignment rights with him at the outset of the interview. Additionally, it is undisputed that, after being given his Miranda warnings, the defendant openly admitted to firing two shots into the car window where the victim was sitting, and the defendant does not contend on appeal that his confession was coerced. No deterrent purpose would be served by granting suppression in these circumstances.[4]

---

[4] While § 99 defines "interception" as secretly hearing or recording the contents of any wire or oral communication through the use of any intercepting device, the act only penalizes individuals who commit willful interceptions. See G. L. c. 272, § 99 B 4, C 1. As there is nothing to suggest that the officers in this case willfully recorded the defendant without his knowledge, they would not be subject to § 99'ssignificant penalties, which further supports the contention that no absurd result would come from adhering to the statute's plain text in

this case. See Commonwealth v. Brennan, 481 Mass. 146, 154 (2018) ("Wilful conduct is that which is 'intentional rather than accidental . . .'" [citation omitted]).

Notify

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
CIVIL ACTION
NO. 2015-01733-BLS1

**KAMYRA WALKER and another,[1]**
**on behalf of themselves and other similarly situated**

**vs.**

**BOSTON MEDICAL CENTER CORP. and others [2]**

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT BOSTON MEDICAL CENTER CORP.'S MOTION FOR SUMMARY JUDGMENT**

In March 2014, defendant Boston Medical Center, Corp. (BMC) learned that another health care provider had inadvertently accessed a BMC patient's medical information on a website maintained by defendant MDF Transcriptions, LLC (MDF), a medical transcription company used by both BMC and this other provider. It sent a letter to all its patients who had records that had been transcribed by MDF informing them that there might have been unauthorized access to their medical information. After receiving this letter, the plaintiffs Kamyra Walker and Anne O'Rourke, filed this putative class action against BMC, MDF, and Richard Fagan, MDF's owner and manager. They assert that the defendants are liable to them, and all other similarly situated BMC patients, for failing to ensure that their medical information was kept confidential. The case is before the court on BMC's motion for summary judgment. BMC argues, among other things, that the plaintiffs lack standing to maintain the claims asserted

---

[1] Anne O' Rourke

[2] MDF Transcription, LLC and Richard J. Fagan.

against it.[3] For the reasons that follow, the motion is **ALLOWED**.

## BACKGROUND

For several years, certain BMC medical practices used MDF to transcribe their physicians' audio recorded patient notes. The transcriptions were available through a "file transfer protocol" (FTP or .ftp) site maintained by MDF.[4]

On March 4, 2014, Pam Bronson of Access Sports Medicine (ASM), another MDF customer, telephoned BMC. She informed BMC that she saw a BMC transcription record when she accessed MDF's transcription portal using her ASM user name and password. In response, BMC contacted MDF, and MDF took down the FTP site. Shortly thereafter, BMC terminated its relationship with MDF and notified patients, including the plaintiffs, of what had occurred.

The notification letter sent to the plaintiffs informed them that their patient records from office visits with physicians "were inadvertently made accessible to the public through [MDF's] online site." The letter also noted that the site "was not password protected and could potentially be accessed by non-authorized individuals." There is no evidence in the record, however, that the website was ever accessible to the general public, as opposed to an individual that was associated with another MDF customer and who should only have had access to that customer's transcriptions. The only admissible evidence in the summary judgment record is consistent with a finding that the FTP site was only accessible to an MDF customer with a user name and password.[5]

---

3 BMC also argues that the complaint fails to state a claim on which relief may be granted. Having found that the plaintiffs lack standing to bring their claims, the court does not reach this issue.

4 "FTP, or file transfer protocol, is a protocol for exchanging files over any computer network that supports the TCP/IP protocol (such as the Internet or an intranet). *SRI Int'l Inc. v. Internet Sec. Sys.*, 647 F. Supp. 2d 323, 332 n.2 (D. Del. 2009).

5 Plaintiffs note that Joseph Cumillus, BMC's 30(b)(6) deponent, stated in his deposition: "it was concerning to me that this information was on an FTP site that wasn't password protected." The court understands this to refer

No social security numbers or financial information was contained in the BMC transcription records on MDF's FTP site, including plaintiffs' records. The addresses and birth dates of some individuals were contained in the records on the site, but plaintiffs' addresses and birth dates were not. Walker's transcription records only contained her name, medical record number, and treatment information. O'Rourke's transcription records likewise only contained her name and treatment information. There is no evidence that the transcription record that Bronson saw was associated with either plaintiff.

**DISCUSSION**

The plaintiffs' complaint contains six counts against BMC: Invasion of Privacy under G. L. c. 214, § 1B (Count I); Breach of Confidentiality (Count II); Breach of Fiduciary Duty (Count III); Negligence (Count IV); Negligent Supervision (Count V); and Breach of Implied Contract (Count VI). The plaintiffs lack standing to bring any of these claims.

To have standing, a plaintiff must show that it has suffered or is in danger of immediately suffering a concrete and legally cognizable injury. See *Pugsley v. Boston Police Dept.*, 472 Mass. 367, 371, 373 (2015). The injury must be a direct and ascertainable result of the defendant's alleged actions. *Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court*, 448 Mass. 15, 21 (2006). Injuries that are speculative, remote, or indirect are insufficient to confer standing. *Id.*; see also *Warth v. Seldin,* 422 U.S. 490, 501 (1975) (plaintiffs must allege "distinct and palpable injury" to invoke judicial intervention).

While the notification letter sent to plaintiffs painted a disquieting picture that might have alarmed a BMC patient who received it, there is no evidence in the summary judgment record

to the incident in which another health care provider customer of MDF was able to access a transcription that should have only been accessible to a BMC user with a system qualified user name and password. There is no evidence that the MDF .ftp site could be accessed by someone who did not have and MDF .ftp user name and password. Indeed, as discussed above, there is only evidence that one other MDF customer was able to access BMC transcriptions on one occasion.

that any unauthorized person ever saw either transcriptions relating to either plaintiff's medical treatment at BMC. In fact, there is no evidence that what happened on the MDF .ftp portal constituted the type of data breach that has garnered so much media attention and provoked anxiety among consumers. All the summary judgment record in this case demonstrates is that in March 2014, an employee of ASM, another MDF health care provider customer, inadvertently accessed one file associated with an unidentified BMC patient and promptly reported that fact to BMC. The plaintiffs have submitted no evidence that this healthcare provider or any other third party viewed the plaintiffs' records or misused the information contained therein.[6] Nor have they offered any evidence that BMC patient information, more generally, was ever accessed by members of the public or even additional MDF customers during this period of time. Plaintiffs have therefore failed to show that they suffered or are in danger of immediately suffering a concrete injury related to the March 2014 incident. Compare *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 387-391 (6th Cir. 2016) (plaintiffs had standing where hackers stole *their* personal information from insurance company); *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 692-694 (7th Cir. 2015) (plaintiffs had standing where hackers stole *their* credit card numbers from department store and over 9,200 credit cards were known to have been used fraudulently); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1323-1324 (11th Cir. 2012) (plaintiffs had standing where healthcare provider's unencrypted laptop computers containing customers' sensitive information were stolen and plaintiffs became victims of identity theft). In other words, lacking in this case is any evidence that any unauthorized person ever saw plaintiffs' transcriptions; the possibility that it could have happened is inadequate to confer standing. See

---

6 Walker maintains that fraudulent income tax returns were filed in her name in 2012 and 2013 but fails to provide any evidence that links those filings with any personal information contained in her BMC transcription. A tax return requires a social security number, something that was not in Walker's transcriptions.

*Clapper v. Amnesty Int'l USA*, 1333 S. Ct. 1138 (2013) (Where the Supreme Court explained that a "theory of standing[] which relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending.")

In arguing that they have standing, plaintiffs principally rely on *Tabata v. Chalreston Area Medical Center, Inc.*, 233 W. Va. 512 (2014). In *Tabata,* the West Virginia court found that the plaintiffs' personal and medical information (i.e., their names, contact details, social security numbers, dates of birth, and certain basic respiratory care) was placed on the internet for six months in a manner that could have been accessed by the general public using "an advanced internet search". *Id.* at 462 & n.1. Although discovery revealed no unauthorized or malicious users who had attempted to obtain the information, the Court concluded, without very much analysis, that the plaintiffs had standing to bring their invasion of privacy and breach of confidentiality claims. *Id.* at 463-465. The decision is inapposite. Even assuming that Massachusetts appellate courts would follow *Tabata* and find that the potential exposure of one's personal information to others constitutes a cognizable injury, the plaintiffs' claims in this case are quite different. The information in the BMC transcriptions theoretically available to an authorized user was very different than the detailed personal information at issue in *Tabata.* Moreover, the only "unauthorized" persons who might have had access to the plaintiffs' information were, at most, other medical provider customers of MDF, who were also subject to the confidentiality restraints applicable to all health care providers.[7]

[7] The plaintiffs argue that the possibility of disclosure of private facts, like those allegedly contained in the transcriptions, without more will constitute an invasion of privacy in violation of G.L. c. 214, § 1B. See, e.g., *Polay v. McMahon*, 468 Mass. 379 (2014) ("To sustain an invasion of privacy, the invasion must be both unreasonable and substantial or serious."). This distinguishes their claim from those alleging economic loss in which courts have held that when data was stolen for the deliberate purpose of obtaining credit card information, there was an objectively reasonable likelihood that injury had occurred or was impending, but when the possibility of harm from unauthorized viewing was speculative plaintiffs had no standing. See, e.g., *Remijas v. Neiman Marcus Grp.*, LLC, 794 F.3d 688,693 (7th Cir. 2015). The court disagrees. Even if the transcriptions

The plaintiffs seemingly suggest that it is BMC's fault that they do not have any evidence of unauthorized access of their transcriptions to support their claims. They blame BMC for failing to conduct a thorough investigation into the scope and nature of the "breach." Whether, for other purposes, BMC should have conducted a more intensive investigation is not an issue germane to the pending motion. In the context of this civil litigation, it was not BMC's responsibility to prove that the BMC records on the FTP site were never accessed or misused by others. As the plaintiffs in this lawsuit, it was their burden to present some evidence in the summary judgment record establishing harm or immediate risk of harm related to the March 2014 incident. Plaintiffs, however, did little to develop their case in discovery after filing their complaint. For example, there is no evidence in the summary judgment record suggesting that they undertook steps to obtain information about whether any other customers in addition to ASM had experienced a similar incident in which that customer had access to transcriptions relating to the patient of some other health care provider, let alone BMC. In fact, there is no evidence in the summary judgment record that any ASM employee other than Bronson viewed records on the FTP site relating to a patient of some other health care provider, whether BMC or some other provider. In consequence, plaintiffs have been unable to offer any evidence that their records were viewed or misused, or that there is an immediate danger that this will occur. Absent such evidence, they cannot demonstrate they have standing to bring their claims. [8]

---

contained very personal, health care information (an allegation the court declines to address), the plaintiffs must provide evidence, beyond mere speculation, that there was unauthorized viewing of the information.

[8] In opposing the motion, plaintiffs rely on an affidavit from Fagan. The information contained in that affidavit, however, is not based on personal knowledge, does not relate to the incident in question, and is not useful on the question of standing.

**ORDER**

For the foregoing reasons, the defendant Boston Medical Corp.'s motion for summary judgment is **ALLOWED**. Although there are two remaining defendants in this action, MDF Transcription, LLC and Richard J. Fagan, MDF has apparently ceased operations and never answered the complaint and Fagan has filed a bankruptcy petition which is still pending. The court therefore finds that there is no just reason for delay and directs that a final judgment enter dismissing this action as to the defendant Boston Medical Corp.

M H Kaplan
Mitchell H. Kaplan
Justice of the Superior Court

Dated: June 7, 2017

16

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT
Civil No. 22-2509-BLS1

JOE ALVES[1]
Plaintiff

vs.

BJ's WHOLESALE CLUB, INC
Defendant

**MEMORANDUM AND ORDER ON MOTION TO DISMISS**

Plaintiff Joe Alves brings this class action to challenge the alleged use by BJ's Wholesale Club, Inc. ("BJ's") of Session Replay Code ("SRC") to record visitors' activity on its website. Alves asserts that use of the code violates the Massachusetts Wiretap Statute, G.L. c. 272, § 99, and is an invasion of privacy actionable under G.L. c. 214, § 1B. BJ's moves to dismiss the Complaint for failure to state a claim. For the following reasons, the motion must be denied.

**BACKGROUND**

The following background (other than footnote 2) is taken from plaintiff's Class Action Complaint ("Complaint").

SRC is a JavaScript computer code that, when embedded on a website, enables website operators to record, save, and replay visitors' interactions with the website. SRC provides online marketers and website designers with insights into the user experience. Typically, the server receiving the data from the code is controlled by a third-party Session Replay Provider ("SRP"), rather than the owner of the website where the code is embedded. SRC goes well beyond normal

[1] On behalf of himself and all others similarly situated.

website analytics. It allows the capture and recording of nearly every action a visitor takes while visiting a website, including mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entry, and other forms of a user's navigation and interaction on the website. Recording this data permits SRPs to create a reenactment of a user's visit to the website in the form of a video. Typical analytic services that provide aggregate statistics do not do this.

SRC does not necessarily anonymize user sessions. Personally identifiable information typed by the website visitor and displays of user account information to a logged-in user can be captured by the code. SRPs often create "fingerprints" unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information. This fingerprint may be collected across all sites that the SRP monitors. If a user identifies themselves to one of these websites (e.g., by filling out an on-line form), the SRP can associate the fingerprint with the user's identity and back reference the user's other browsing activity. In addition to fingerprinting, SRPs also sometimes offer website owners cookie functionality that permits linking a session to an identified user.[2]

---

[2] A quick search on the Internet reveals the existence of a number of SRC providers and considerable information about the many uses of session replay software. See, e.g., "The definitive guide to session reply" (Mar. 25, 2023) ("Session replay capabilities elevate traditional web analytics tools by showing a complete picture of the user on a website or app."), available at https://www.fullstory.com/session-replay/; "Top 7 session replay tools for analyzing user behavior," (Feb. 28, 2023) ("A session replay, also known as a session recording, is a rendering of a user's journey through your website. Session replays show you what individual users saw and how they experienced your site during their visit—including their clicks, page scrolls, and mouse movements."), available at https://www.hotjar.com/blog/session-replay-tools/; Matsakis, L., "Over 400 of the World's Most Popular Websites Record Your Every Keystroke, Princeton Researchers Find," (Nov. 20, 2017) ("third-party scripts that run on many of the world's most popular websites track your every keystroke and then send that information to a third-party server"), available at https://www.vice.com/en/article/59yexk/princeton-study-session-replay-scripts-tracking-you. The Internet also reflects growing legal interest in litigation surrounding the use of SRC. See, e.g., Stegmaier, G, Quist, M., & Bart, A., "Lawsuits Accusing Online Session Replay of Criminal 'Wiretapping' Implicate Serious Constitutional Concerns," Washington Legal Foundation (Apr. 28, 2023), available at https://www.wlf.org/2023/04/28/

BJ's operates brick and mortar stores and a website that sells grocery items, electronics, furniture, and other products. It has embedded SRC from various SRPs on its website. The SRC operates unbeknownst to the website's visitors, to track those visitors' "mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time."[3] Defendant's SRPs create video replays of the behaviors of visitors to defendant's website and provides it to BJ's for analysis.

In late 2021 and early 2022, plaintiff visited defendant's website on his computer and cell phone to shop for tires. His activity was captured using the website's embedded SRC and sent to various SRPs.

**DISCUSSION**

**I. The Rule 12(b)(6) Standard**

On a motion under Mass. R. Civ. P. 12(b)(6), I must accept as true the factual allegations in the complaint and draw "all reasonable inferences" from those allegations in favor of plaintiff.

---

publishing/lawsuits-accusing-online-session-replay-of-criminal-wiretapping-implicate-serious-constitutional-concerns/; "Litigation Minute: Pennsylvania and Florida Emerge as Fertile Ground for Session Replay Litigation," The National Law Review (Apr. 18, 2023), available at https://www.natlawreview.com/article/litigation-minute-pennsylvania-and-florida-emerge-fertile-ground-session-replay; Bilus, A, Lipchitz, J. & Burdette, A., "Tips for Protecting Your Business from Wiretap Lawsuits Targeting Companies with Consumer-Facing Websites," American Bar Association (Feb. 22, 2023), available at https://www.americanbar.org/groups/litigation/committees/privacy-data-security/practice/2023/tips-protecting-business-wiretap-lawsuits/; Coyer, C., "Session Replay Software Again Faces Legal Challenges, But Likely Not for Long," Law.com (Sept. 16, 2022), available at https://www.law.com/legaltechnews/2022/09/16/session-replay-software-again-faces-legal-challenges-but-likely-not-for-long/. All links were last viewed June 21, 2023.

[3] The SRC provided by Microsoft Corporation, one of BJ's SRPs, generates basic information about website user sessions, interactions, and engagement, and breaks down users by device type, country, and other criteria.

Dunn v. Genzyme Corp., 486 Mass. 713, 717 (2021). While the factual allegations in a complaint need not be detailed, they must set forth the basis for plaintiff's entitlement to relief with "more than labels and conclusions," Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); and must "'be enough to raise a right to relief above the speculative level[,]' . . . 'plausibly suggesting (not merely consistent with)' an entitlement to relief." Iannacchino, 451 Mass. at 636 (internal citations omitted), quoting Bell Atl., 550 U.S. at 555, 557. I address each count of the Complaint in turn.

## II. Massachusetts Wiretap Statute (Count I)

Count I asserts that defendant's use of SRC violates the Massachusetts Wiretap Statute, G.L. c. 272, § 99(Q), which provides a remedy for "[a]ny aggrieved person whose oral or wire communications were intercepted, disclosed or used . . . or whose personal or property interests or privacy were violated by means of an interception," unless the interception was permitted under the Wiretap Statute.[4] See Commonwealth v. Ennis, 439 Mass. 64, 68 (2003) (Wiretap Statute "sought to curtail [ ] 'grave danger[ ]' of 'the uncontrolled development and unrestricted use of modern electronic surveillance devices,' which the Legislature termed a danger 'to the privacy of all citizens.'"), quoting G.L. c. 272, § 99(A). BJ's argues that plaintiff has failed plausibly to allege that its conduct concerned wire communications or amounted to an interception.[5] I disagree.

---

[4] Plaintiff does not claim that defendant's SRC intercepted oral communications.

[5] Although Section 99(Q) also prohibits use or disclosure of wire communications (not simply interception), plaintiff's claim primarily focuses on defendant's interception of his data. Defendant's argument likewise focuses on whether its purported use of SRC resulted in an interception. BJ's argues that plaintiff failed to plead use or disclosure with sufficient particularity, a position plaintiff contests. Because I conclude that plaintiff has plausibly alleged that an interception occurred, I need not address defendant's additional argument.

### A. Wire Communication

The Wiretap Statute defines a "wire communication" as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." G.L. c. 272, § 99(B)(1). BJ's argues that plaintiff's Complaint does not implicate "wire communications" because the alleged Internet-based interactions (i) are not communications, and (ii) do not involve use of "a wire, cable, or other like connection." At this pleading stage, I am not persuaded this is correct.

The Wiretap Statute does not define "communication" and no Massachusetts decision expounds on its meaning. Webster's Third New International Dictionary first defines "communication" as "the act or action of imparting or transmitting <the ~ of the common cold> <the ~ of power to the machine>."[6] Webster's Third New International Dictionary at 460 (2002). See Commonwealth v. Moody, 466 Mass. 196, 208-209 (2013) (because "record" not defined in Wiretap Statute, court looked to "common and approved usage," including Webster's Third New International Dictionary). Given this definition, the term as used in the Wiretap Statute may fairly be interpreted to encompass the website interactions captured by SRC. The mouse movements, clicks, keystrokes, and other browsing activity that SRC records plausibly constitute an exchange of information between the website's owner and the website user. See, e.g., Hammerling v. Google LLC, 615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022) ("Although there is

---

[6] Accord State v. Ozuna, 184 Wash. 2d 238, 247 (2015) ("communication" is "the act or action of imparting or transmitting" or the "interchange of thoughts or opinions: a process by which meanings are exchanged between individuals through a common system of symbols (as language, signs, or gestures)"), quoting Webster's Third New International Dictionary 460 (2002); Regents of Univ. of Minnesota v. AGA Med. Corp., No. 07-CV-4732 PJS/LIB, 2011 WL 13943 at * 3 n.4 (D. Minn. Jan. 4, 2011); Rafferty v. NYNEX Corp., No. CIV.A.87-1521HHG/PJA, 1989 WL 38946 at * 1 (D.D.C. Apr. 4, 1989).

some oddity in construing the collection of data related to app usage as involving 'communications,' it is at least plausible that it does."); Revitch v. New Moosejaw, LLC, No. 18-CV-06827-VC, 2019 WL 5485330 at *1 (N.D. Cal. Oct. 23, 2019) ("[A] customer who calls to inquire about a store's products undoubtedly communicates with the retailer. As does an online patron. Revitch requested information from Moosejaw by clicking on items of interest; Moosejaw responded by supplying that information. This series of requests and responses – whether online or over the phone – is communication.").

Defendant's argument that an Internet-based interaction does not occur by using wire, cable, or another like connection, disregards plaintiff's allegations, see, e.g., Complaint ¶¶ 24 ("website delivers [SRC] to a user's browser"), 25 ("Events are typically accumulated and transmitted in blocks periodically throughout the user's website session"), 49 (SRC provides "instantaneous transmissions to the [SRP]"), 70, 76, and overlooks the fact that the mechanism for Internet interactions is the result of technology rooted in telephone infrastructure. Cf. United States v. Lyons, 740 F.3d 702, 716 (1st Cir. 2014) ("the internet is an 'instrumentalit[y] . . . used or useful in the transmission of writings, signs, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission.'"), quoting 18 U.S.C. § 1081. Moreover, the Supreme Judicial Court has not narrowly construed the phrase "wire communication." See Moody, 466 Mass. at 208 (definition of "wire communication" in Wiretap Statute is "broad[ ]" and encompasses "non-oral electronic transmissions"). Thus, although there appears to be no Massachusetts authority directly on point, Internet-based interactions plausibly involve the use of cable or wire or, at the very least, a

connection "like" cable or wire.[7] BJ's is not entitled to dismissal of Count I for failure plausibly to allege that the SRC affected a wire communication.[8]

**B. Interception**

In relevant part, under the Wiretap Statute, "'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4) (emphasis added). BJ's contends that, even if plaintiff's interaction with its website constituted wire communications, plaintiff has failed to allege an "interception" because it has failed to allege (i) that the contents of any wire communication were recorded during his visits to its website, or (ii) that SRC is an intercepting device. These arguments are also unavailing.

**1. Contents**

The term "contents," as used in the definition of "interception," "means any information concerning the identity of the parties to [any wire or oral] communication or the existence,

---

[7] BJ's relies on Mastel v. Miniclip SA, 549 F. Supp. 3d 1129, 1134-1136 (E.D. Cal. 2021), which analyzed a claim brought under the first clause of Cal. Penal Code § 631(a). Unlike the Massachusetts Wiretap Statute, § 631(a) applies only to the tapping of a "telegraph or telephone wire, line, cable, or instrument." (Emphasis added). Mastel, 549 F. Supp. 3d at 1134-1136. The case is inapposite in the context of the Massachusetts Wiretap Statute's broader language.

[8] Citing to "the point of origin and the point of reception" language in the definition of "wire communication" and Ninth Circuit case law, BJ's also argues that plaintiff has not alleged an actionable wire communication because he admits that SRC intercepts contents only after it is received. See Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 876-879 (9th Cir. 2002) (for website to be "intercepted" in violation of the federal wiretap act it must be acquired during transmission, not while it is in electronic storage). Even assuming the Massachusetts Wiretap Statute contains a real-time interception requirement, I do not read the Complaint as making such an admission. See Complaint, ¶¶ 1, 24, 78. See also In re Pharmatrak, Inc., 329 F.3d 9, 21 (1st Cir. 2003) (declining to adopt or reject real time requirement, but stating "the storage-transit dichotomy adopted by earlier courts may be less than apt to address current problems").

contents, substance, purport, or meaning of that communication." Id. at § 99(B)(5). Defendant argues that SRC does not capture "content," but simply records the actions of a website visitor. Given the breadth of the statutory definition, the Complaint plausibly suggests that keystrokes, clicks, mouse movements, URLs, and other data allegedly recorded by SRC constitute contents. See Commonwealth v. Mejia, 64 Mass. App. Ct. 238, 243 (2005) ("'Contents' . . . is defined broadly"), quoting District Attorney for Plymouth Dist. v. New England Tel. & Tel. Co., 379 Mass. 586, 591-592 (1980).

The authorities that BJ's cites are not persuasive. To argue that its SRC did not record "contents," BJ's points to Commonwealth v. Hyde, 434 Mass. 594, 605 n.11 (2001), and Commonwealth v. Camilli, 81 Mass. App. Ct. 1129, 2012 WL 1284387 at * 2 n.4 (Apr. 17, 2012) (Rule 1:28 decision). Both decisions held that silent video recordings did not implicate the Wiretap Statute because they did not intercept "oral communications" under the statute. Although BJ's argues that SRC is analogous to a surveillance camera that does not record audio, here we are dealing with "wire communications," which were not at issue in either case.

Defendant also cites several decisions from Florida and California that address whether SRC and other software violated Florida, California, and/or federal wiretap statutes. See, e.g., Jacome v. Spirit Airlines Inc., No. 2021-000947-CA-OI, 2021 WL 3087860 at * 4 (Fla. Cir. Ct. June 17, 2021) (no content intercepted under Florida statute); Brodsky v. Apple Inc., 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (under federal and California statutes "user names, passwords, and geographic location information are not contents"). However, all three statutes define "contents" much more narrowly than G.L c. 272, § 99(B)(5), as any "information concerning the substance, purport, or meaning of [any wire, oral, or electronic] communication." 18 U.S.C. § 2510(8); Fla. Stat. § 934.02(7); Brodsky, 445 F. Supp. 3d at 127 (Cal. Penal Code §

631(a) incorporates definition in 18 U.S.C. § 2510(8)). In contrast, the Massachusetts statute defines "contents" also to include "information concerning the identity of the parties" or "the existence . . . of that communication."[9] Accordingly, the Florida and California cases have little persuasive value. See In re Zynga Privacy Litig., 750 F.3d 1098, 1106 (9th Cir. 2014) ("the term 'contents' under the federal wiretap statute refers to the communication's intended message and not record information regarding the characteristics of the message from the fact that the definition of contents was amended in 1986 to remove the phrase "identity of the parties to such communication").[10] Plaintiff has sufficiently alleged that the SRC on defendant's website recorded the "contents" of a wire communication under the Massachusetts Wiretap Statute.

**2. Intercepting Device**

BJ's also argues that SRC is not an intercepting device. The Massachusetts Wiretap Statute defines an intercepting device, in relevant part, as:

> any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication . . . other than any telephone or telegraph instrument, equipment, facility, or a component thereof, . . . furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business . . . "

G.L. c. 272, § 99(B)(3) (emphasis added). BJ's asserts that SRC is not a device or apparatus, or falls within the clause that begins "other than," which is referred to as the telephone equipment exception. Neither contention is availing.

---

[9] The Massachusetts statute also circularly defines "contents" to include "any information concerning . . . the . . . contents . . . of that [wire] communication." G.L. c. 272, § 99(B)(4).

[10] Both Florida and California courts look to In re Zynga Privacy Litigation to determine if "contents" have been intercepted. See, e.g., Jacome, 2021 WL 3087860 at * 3; Brodsky, 445 F. Supp. 3d at 127.

In support of its first argument, defendant relies entirely on In re Facebook Internet Tracking Litig., a decision in which a federal district court in California dismissed a lawsuit alleging that Facebook violated the California wiretap statute by embedding cookies in plaintiffs' internet browsers. 140 F. Supp. 3d 922, 925, 937 (N.D. Cal. 2015). The court found the plaintiff's complaint failed to state a claim because it "only define[d] a cookie as a small text file containing a limited amount of information which sits idly on a user's computer until contacted by a server." Id. at 937. Because the facts here are different, the decision is inapposite. SRC is significantly different from the cookies at issue in that case; SRC allegedly captures an individual's data in a manner that is much more active and invasive. Several other decisions have suggested that SRC may be an intercepting device. See Rich v. Rich, No. BRCV200701538, 2011 WL 3672059 at *6 (Mass. Super. July 8, 2011) (McGuire, J.), quoting G.L. c. 272, § 99(B)(3) (key logger program was "an 'intercepting device' (at least when surreptitiously installed on a computer) because it 'is capable of . . . recording a wire . . . communication'"); Makkinje v. Extra Space Storage, Inc., No. 8:21-CV-2234-WFJ-SPF, 2022 WL 80437 at *2 (M.D. Fla. Jan. 7, 2022) (software may constitute a device in wiretapping context); United States v. Hutchins, 361 F. Supp. 3d 779, 795 (E.D. Wis. 2019) ("The majority of courts to consider this issue have entertained the notion that software may be considered a device for the purposes of the [Federal] Wiretap Act.").

With regard to its second contention, BJ's cites Dillon v. Massachusetts Bay Transp. Auth., 49 Mass. App. Ct. 309 (2000), as suggesting the SRC that it deploys, which it obtained from third-party SRPs, falls under the telephone equipment exception, i.e. the equivalent of "telephone . . . equipment . . . furnished to a subscriber or user by a communications common carrier [i.e., a telephone company] in the ordinary course of its business." In Dillon, the court

held that recording machines were covered by the exception even though they were furnished by non-telephone company sources. 49 Mass. App. Ct. at 314-316. In so ruling, it explained:

> We do not depart lightly from the express wording of a statute, but in the unusual circumstances appearing here . . . a deviation is justified. The fact that there has been no amendment of the Massachusetts statute . . . does not bar us from reading the exception so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases; the plaintiffs' proposal would in effect destroy the exception. Thus the decision below comports with the canons that interpretation should tend to preserve the substance of a statute rather than diminish it; should not override common sense; or produce absurd or unreasonable results — in this case the absurdity of allowing the fortuity of the source of the equipment to entail serious material consequences.

Id. at 315–316 (internal citations and footnote omitted). This analysis offers little guidance as to whether our appellate courts would depart even more dramatically from the language of G.L. c. 272, § 99(B)(3), and expand the exception to include software such as SRC, which has characteristics quite different from telephone equipment. Without such guidance, I decline to deviate so substantially from the statute's plain language.[11]

## III. Invasion of Privacy Claim

Plaintiff asserts that use of SRC is an invasion of privacy under G.L. c. 214, § 1B ("A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."). A claim of violation of Section 1B may be either

[11] BJ's contends that it used SRC in the ordinary course of business, a phrase which "translates as legitimate business purpose." Dillon, 49 Mass. App. Ct. at 319 (internal quotes omitted). Even assuming SRC could be considered telephone equipment, whether this is true would be a question of fact not properly resolved on a motion to dismiss. Cf. Marquis v. Google, Inc., No. 11-2808, 2012 WL 12929513 at * 4 (Mass. Super. Jan. 17, 2012) (Lauriat, J.) ("At this preliminary stage, the court cannot conclude as a matter of law that intercepting and scanning emails for purposes of 'interest-based advertising' is 'in the ordinary course of [Google's] business' under the Massachusetts wiretap statute.").

based on public disclosure of private facts or intrusion upon the plaintiff's solitude or seclusion, i.e., an infringement upon the right to be left alone. Polay v. McMahon, 468 Mass. 379, 382 (2014). In either case, the plaintiff must plausibly allege that the invasion was both unreasonable and substantial or serious. Id.

At the hearing, plaintiff clarified that his claim is based on an intrusion upon his solitude or seclusion, rather than the disclosure of private facts. See also Complaint ¶ 90. "Factors . . . considered in assessing whether there has been an intrusion that is unreasonable, as well as substantial or serious, include the location of the intrusion, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." Polay, 468 Mass. at 383. The court must "balance the extent to which the defendant violated the plaintiff's privacy interests against any legitimate purpose the defendant may have had for the intrusion." Id. Typically, whether an intrusion is unreasonable, substantial, or serious is a fact question. Id.[12]

Plaintiff contends he has alleged an intrusion on his solitude or seclusion by alleging that each time he visited defendant's website on his smartphone or computer, the SRC secretly collected his personal data in real-time for defendant's monetary gain without his consent. I am somewhat skeptical that these allegations are sufficient to state a claim for invasion of privacy. Among other things, plaintiff has failed to allege clearly that BJ's was able to connect his identity to the data collected or that the data collected was particularly personal or sensitive. The Complaint merely alleges that plaintiff went to defendant's website to shop for tires, an activity

[12] In Polay, the Court explained that "[m]ost of our jurisprudence under th[e] statute has involved public disclosure of private facts[.]" 468 Mass. at 382, citing Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 382 n.16, cert. denied sub nom Globe Newspaper Co., Inc. v. Ayash, 546 U.S. 927 (2005). In such cases, "[t]he statute, essentially, proscribes 'disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest.'" Ayash, 443 Mass. at 383, quoting Bratt v. International Business Mach. Corp., 392 Mass. 508, 518 (1984).

unlikely to reveal information that is either particularly personal or of durational relevance. Cf. In re Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 604 n.7 (9th Cir. 2020) ("individuals have a reasonable expectation of privacy in collections of information that reveal familiar, political, professional, religious, and sexual associations") (internal quotes omitted), cert. denied, 141 S Ct. 1684 (2021); McLaughlin v. Meehan, No. 1681CV00866, 2018 WL 1041371 at *10 (Mass. Super. Jan. 19, 2018) (Tuttman, J.) (plaintiff stated claim where defendants searched his computer files, including email accounts, containing his "thoughts, ideas, and communications").

Nevertheless, for three reasons I am hesitant at this early stage to conclude as a matter of law that the SRC on defendant's website did not cause the type of intrusion covered by the statute. First, the question of whether an intrusion transgresses the privacy statute is a fact question. Second, as suggested by some of the statistics cited in the Complaint, what constitutes acceptable data collection on the Internet appears to be evolving. See, e.g., Polay, 468 Mass. at 383 ("[T]he Legislature appears to have framed the statute in broad terms so that the courts can develop the law thereunder on a case-by-case basis, by balancing relevant factors . . . and by considering prevailing societal values and the ability to enter orders which are practical and capable of reasonable enforcement."), quoting Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514, 519 (1991). Third, plaintiff's claim under the Wiretap Statute will proceed to discovery and the scope of discovery will not differ if plaintiff's claim under G.L. c. 214, § 1B remains.[13]

[13] BJ's also argues plaintiff's privacy claim fails because its interest in collecting plaintiff's data does not outweigh his privacy interest. This is a question of fact not appropriate for resolution on a motion to dismiss. See Polay, 468 Mass. at 384 ("Whether McMahon acted for the legitimate purpose . . . that outweighs any incidental intrusion on the plaintiffs' privacy . . . is . . . a question of fact not suitable for resolution on a motion to dismiss.").

BJ's also argues with limited analysis that plaintiff may only look to the Wiretap Statute for relief because G.L. c. 272, § 99(Q), provides an exclusive civil remedy for those "whose personal or property interests or privacy were violated by means of an interception" and the invasion of privacy claim is based on the same facts.[14] In support, defendant cites two trial court decisions: Christensen v. Cox, No. SUCV201701635BLS1, 2017 WL 7053911 at * 7 (Mass. Super. Nov. 21, 2017) (Leibensperger, J.), and Tedeschi v. Reardon, 5 F. Supp. 2d 40, 46 (D. Mass. 1998) (Stearns, J.). In both cases, the trial court concluded that the Wiretap Statute is the exclusive remedy when conversations are illegally intercepted. Neither decision, however, offers much reasoning to support its conclusion. Christensen merely cites to Tedeschi and Tedeschi merely cites to G.L. c. 272, § 99(Q) and Charland v. Muzi Motors, Inc., 417 Mass. 580, 585-586 (1994), which held that G.L. c. 151B provides the exclusive remedy for employment discrimination not based on pre-existing tort law or constitutional protections. Charland was based, at least in part, on the existence of an exclusivity provision in G.L. c. 151B. 417 Mass. at 584-585. The Wiretap Statute does not have a comparable exclusivity provision. Thus, it is unclear whether the Legislature intended the two remedies to co-exist in the situation before me. While defendant's argument may ultimately have merit, without more comprehensive analysis from the parties, I am reluctant to decide the issue on a motion to dismiss for the same reasons discussed above – dismissal will not change the overall scope of the case.[15]

---

[14] The Wiretap Statute was enacted in substantially its present form in 1968, before the enactment of G.L. c. 214, § 1B.

[15] At the hearing, plaintiff suggested that his privacy claim was based not on an interception occasioned by the SRC but on BJ's "embedding" code on his browser. Even setting aside that this was not clearly pled in the Complaint or argued in plaintiff's opposition, such a claim would necessarily fail. It is difficult to understand how merely installing SRC, as opposed to (or without) its active use, results in any invasion of privacy. Cf. Polay, 468 Mass. at 381-385

**ORDER**

Defendant's Motion to Dismiss (Docket #12) is **DENIED**.

Dated: June 21, 2023

Peter B. Krupp
Justice of the Superior Court

(plaintiff stated claim for invasion of privacy where plaintiff alleged defendant's cameras *recorded* plaintiffs' house).

VM

13

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BUSINESS LITIGATION SESSION

JOE ALVES, individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BJ'S WHOLESALE CLUB, INC.,

Defendant.

CIVIL ACTION NO. 2284CV02509

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

Pursuant to Mass. R. Civ. P. 12(b)(6), Defendant BJ's Wholesale Club, Inc. ("BJ's" or "Defendant") hereby moves to dismiss the Complaint filed by Joe Alves ("Plaintiff") in the above-captioned matter for failure to state a claim upon which relief may be granted. In support thereof, BJ's states as follows:

## INTRODUCTION

Digital privacy cases are the latest trend in class-action litigation, and it appears that Mr. Alves has hopped on the bandwagon. Having also sued Goodyear Tire and Rubber Company based on allegations that are strikingly similar to the instant Complaint (*Alves v. Goodyear Tire and Rubber Co.*, 1:22-cv-11820 (D. Mass.) at Doc. 1), Plaintiff now seeks to certify a class of similarly situated plaintiffs that purportedly suffered damages based on BJ's alleged use of common marketing analytics tools on its publicly accessible website, www.bjs.com (the "Website"). Specifically, Plaintiff claims that BJ's alleged use of embedded Session Replay Code

to record electronic transmissions somehow violates the Massachusetts Wiretap Act, G.L. c. 272, § 99—a law created to combat organized crime—and the Massachusetts Invasion of Privacy Statute, G.L. c. 214, § 1B—a law designed to address "unreasonable, substantial or serious interference[s]" with privacy. Now, "[t]his action joins a flurry of virtually identical cases wherein creative class action litigants" have attempted "to attack the use of so-called session replay software on commercial websites." *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1319 (S.D. Fla. 2021). Plaintiff's attempt to criminalize the routine use of data analytics software must be rejected, and his claims should be dismissed.

## FACTUAL ALLEGATIONS

The majority of Plaintiff's 97 paragraph Complaint focuses on the use of Session Replay Code, generally. In comparison, the factual allegations with respect to BJ's are significantly limited. Plaintiff alleges that BJ's hires Microsoft Corporation and other unidentified software vendors "to embed snippets of JavaScript computer code ('Session Replay Code') on [BJ's] website, which then deploys on each website visitor's internet browser for the purpose of intercepting and recording the website visitor's electronic communications with the [BJ's] website, including their mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications in real-time." Compl., ¶1. Plaintiff broadly defines all the foregoing examples as "Website Communications" (*id.*), and then states, in conclusory fashion, that while visiting the Website, his "Website Communications were captured by Session Replay Code and sent to various Session Replay Providers." *Id.* at ¶46. Plaintiff goes on to provide "examples" of the types of information

that can be collected, but fails to specifically allege what, if any, information was captured by the Session Replay Code when Plaintiff visited the Website. *Id.* at ¶¶48-49.[1]

As explained more fully below, Plaintiff's sparse allegations fail to support a conclusion that BJ's "wiretapped" Plaintiff's communications or invaded Plaintiff's privacy.

## ARGUMENT

### I. Legal Standard.

A motion to dismiss pursuant to Mass. R. Civ. P. 12(b)(6) is proper upon a showing that the plaintiff has "failed to state a claim upon which relief can be granted." *Schaer v. Brandeis Univ.*, 432 Mass. 474, 477 (2000). In evaluating a motion to dismiss under this rule, all of the well-pleaded factual allegations in the Complaint are accepted as true, excluding any conclusory assertions not based in fact. *Warner-Lambert Co. v. Execuquest Corp.*, 427 Mass. 46, 47 (1998). Though the factual allegations are taken as true, legal conclusions disguised as factual allegations are not accepted. *Schaer*, 432 Mass. at 477-78. Rather, the plaintiff must set forth factual allegations that plausibly suggest a right to relief beyond mere speculation which may be supported by only "labels and conclusions." *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 636 (2008) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-66 (2007)).

### II. Plaintiff Fails to State a Claim under M.G.L. c. 272, § 99(Q).

Plaintiff's first Count purports to allege a violation of G.L. c. 272, § 99(Q), which provides a cause of action for any person "whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this

[1] Based on BJ's initial investigation and representations from Plaintiff's counsel, it does not appear that Plaintiff was a BJ's member when he allegedly accessed BJ's Website. To the extent discovery reveals that Plaintiff was a BJ's member and subject to an arbitration agreement, BJ's reserves its right to move to compel individual arbitration of this action.

section." Plaintiff claims that BJ's alleged use of the Session Replay Code amounts to an interception, disclosure or use of Plaintiff's communications. Plaintiff's novel theory simply does not fit within the confines of the criminal statute designed to combat organized crime and prevent unlawful wiretapping.

The Massachusetts Wiretap Act, by its plain terms, governs only the unlawful ***interception***, disclosure or use of ***communications***. Under the Massachusetts Wiretap Act, "'interception' means to secretly hear, secretly record, or aid another to secretly hear or secretly record the ***contents*** of any ***wire or oral communication through the use of any intercepting device*** by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99(B)(4) (emphasis added). Further, a "wire communication" means "any communication made in whole or in part through the use of facilities for the transmission of communications ***by the aid of wire, cable, or other like connection*** between the ***point of origin and the point of reception***." *Id.* at § 99(B)(1) (emphasis added).

Thus, to state a claim under section 99(Q), Plaintiff would have to allege, at a minimum, (1) the existence of an oral or wire communication, (2) that the contents of such oral or wire communication were intercepted, (3) that the interception occurred while the communication was in transit, and (4) that the interception was effectuated through the use of an intercepting device. On these points, Plaintiff's Complaint fails.

**A. <u>Plaintiff's Internet Interactions Are Not Oral Or Wire Communications.</u>**

Plaintiff's allegations are based entirely on alleged data collected through Plaintiff's use of an internet website. Plaintiff does not, and cannot, allege that he engaged in an "oral communication."

Nor can Plaintiff allege that he engaged in a "wire communication" with BJ's. As stated above, a "wire communication" is "any communication made in whole or in part ***through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection*** between the point of origin and the point of reception." G.L. c. 272, § 99(B)(1) (emphasis added). Under the plain language of the statute, Plaintiff would have to allege facts supporting a conclusion that the communication at issue was made through the use of a wire, cable or other like connection. Plaintiff does not do so. Instead, Plaintiff alleges that his claim arises solely within the context of alleged interactions with the Website, which occurred entirely within the confines of the internet.

Though Plaintiff alleges the legal conclusion that the data allegedly intercepted "constitute the 'contents' of 'electronic communication[s]' within the meaning of the Act," (Compl., ¶76), Plaintiff's allegation is belied by the remainder of his Complaint. First, the Act does not cover "electronic communications"—that phrase is not even used in section 99. Presumably, Plaintiff intended to allege that his Website interactions were "wire communications," but that, too, fails. Plaintiff has not, and cannot, allege that his interactions with the Website were made "through the use of a wire, cable or other like connection," as is required to state a claim under the Massachusetts Wiretap Act. Internet-based interactions are not covered by the plain language of the Massachusetts Wiretap Act.

Further, Plaintiff's allegation that he "visited www.bjs.com on his computer and ***cell phone*** to shop for tires in late 2021 and early 2022" (Compl., ¶43), does not save his claim. Simply using a cell phone to access the internet does not mean that Plaintiff's internet access falls within the purview of the Massachusetts Wiretap Act. *Compare Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1135 (E.D. Cal. 2021) (explaining that "[a]lthough iPhones contain the word 'phone' in their name,

and have the capability of performing telephonic functions, they are, in reality, small computers," and rejecting application of California's analogous Wiretap Act to "the portion of the iPhone that functions as a computer, not the phone"), *with Com. v. Moody*, 466 Mass. 196, 208 (2013) (finding that ***text messages*** constitute a wire communication because a text message is "a communication transmitted over a cellular network that travels in part by wire or cable or other like connection within a switching station").

Plaintiff must allege that he communicated with BJ's via a wire, cable, or like connection. No matter the specific device that he used, Plaintiff used his ***internet browser*** to allegedly interact with the Website. Plaintiff's alleged use of the internet here does not fall within the Massachusetts Wiretap Act, and his claim must therefore fail as a matter of law.

### B. Plaintiff Has Not Alleged "Contents" of a "Communication."

Even if Plaintiff's internet-based access to the Website could be construed as a "wire communication," Plaintiff has not alleged that the "contents" of his communications were intercepted. G.L. c. 272, § 99 (B)(5) ("The term 'contents', when used with respect to any wire or oral communication, means any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication.").

In his Complaint, Plaintiff merely claims that his "Website Communications" include "mouse movements, clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications." Compl., ¶1. None of this information amounts to information regarding the existence, contents, substance, purport or meaning of a communication.[2] In fact, Plaintiff admits that what BJ's collects is **not** content, but

[2] This is evident by the examples provided by Plaintiff in his Complaint. First, Plaintiff claims that "if a website user places a product in their shopping cart, that information is captured by the Session Replay Code." Compl.,

is merely information "to track and analyze website user interactions with www.bjs.com," which purportedly "provides basic information about website user sessions, interactions, and engagement." *Id.* at ¶¶39, 41. This "basic information" is not content.

Massachusetts Courts have found that non-communicative data, such as silent videos, does not constitute "content" under the Massachusetts Wiretap Act. *Com. v. Hyde*, 434 Mass. 594, 605 (2001) (explaining that the video captured by an onlooker of the Rodney King tragedy would not have been subject to the Massachusetts Wiretap Act because "[a]lthough the Rodney King videotape visually captured the conduct of the police officers' interaction with King, the recording was virtually inaudible, until electronic enhancements filtered the audio portion to allow the actual commands of the police officers to be heard"); *see also Com v. Camilli*, 81 Mass. App. Ct. 1129, at *2 n.4 (2012) (Rule 1:28) (recording a "sting" video did not violate section 99(Q) or the Federal Wiretap Act because the video was silent).

While BJ's has not identified any authority addressing Session Reply Code within the Massachusetts Wiretap Act, several other Courts have addressed this issue under virtually identical state or federal law.[3] Those Courts have almost uniformly found that the data allegedly intercepted by Session Replay Code (if at all) does not constitute the contents of a communication. *See, e.g.*, *Jacome v. Spirit Airlines Inc.*, No. 2021-000947-CA-01, 2021 WL 3087860, at *4 (Fla. Cir. Ct. June 17, 2021) (finding that plaintiff failed to allege any content was intercepted where she alleged that Spirit intercepted "mouse clicks and movements, keystrokes, search terms, information inputted by Plaintiff, and pages and content viewed by Plaintiff"); *Goldstein*, 559 F. Supp. 3d at

---

¶47. Next, Plaintiff claims that entering contact information, such as the user's first and last name, on the Website is captured by Session Replay Code. *Id.* at ¶48.

[3] Interpretation of similar statutes, such as the Federal Wiretap Act, are instructive here. *O'Sullivan v. NYNEX Corp.*, 426 Mass. 261, 264 n. 5 (1997) ("Because the Massachusetts Legislature adopted the language of the Federal statute regulating the interception of wire and oral communications, we shall construe the Massachusetts statute in accordance with the construction given the cognate Federal statute by the Federal courts.") (citing *Crosland v. Horgan*, 401 Mass. 271, 275 (1987); *Vasys v. Metro. Dist. Comm'n*, 387 Mass. 51, 54 (1982)).

1321 (finding that mouse clicks, movements, scroll movements, pages and content viewed, and information voluntarily input like keystrokes, copy and paste, search terms, and information inputted by plaintiff is not content); *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1086 (N.D. Cal. 2018) (finding plaintiff did not allege content and rejecting the argument "that the user was communicating he wanted to view that webpage"); *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1109 (9th Cir. 2014) (finding that plaintiffs failed to state a claim under the Federal Wiretap Act because the "information disclosed in the referer headers at issue is not the contents of a communication"); *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) (considering allegations that Apple intercepted "requests" to access "Third-Party Apps" and finding that plaintiffs "failed to identify the contents of any communication that Apple allegedly intercepted"); *Hammerling v. Google LLC*, No. 21-CV-09004-CRB, 2022 WL 2812188, at *15 (N.D. Cal. July 18, 2022) (allegations that Google collected "sensitive personal data" by tracking use of downloaded applications were insufficient to allege that Google intercepted "contents" of any communication); *Goldstein v. Luxottica of Am., Inc.*, No. 21-80546-CIV, 2021 WL 4093295, at *2 (S.D. Fla. Aug. 23, 2021), *report and recommendation adopted*, No. 21-80546-CIV, 2021 WL 4125357 (S.D. Fla. Sept. 9, 2021) (recommending dismissal with prejudice because "as a matter of law the information Mr. Goldstein alleges the session replay software captured is (1) not 'contents,' (2) not an 'electronic communication,' and (3) not a prohibited 'interception.'"); *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 833 (N.D. Cal. 2021) (content does not include "record information regarding the characteristics of the message that is generated in the course of the communication" such as "the name, address and subscriber number or identity of a subscriber or customer."); *Yale v. Clicktale, Inc.*, No. 20-CV-07575-LB, 2021 WL 1428400, at *3 (N.D. Cal. Apr. 15, 2021) ("[T]he plaintiff predicates her claim in part on information—such as IP addresses,

locations, browser types, and operating systems—that is not content. [. . .] The court dismisses the claim to the extent that it is predicated on non-content information."); *Johnson v. Blue Nile, Inc.*, No. 20-CV-08183-LB, 2021 WL 1312771, at *2 (N.D. Cal. Apr. 8, 2021) (same).

Based on Plaintiff's own allegations, the Session Replay Code did not record the identity, substance, or meaning of a communication—it simply recorded the actions of a user on a website like a surveillance camera recording the movements of a patron in a store for logistical and maintenance purposes. Moreover, Plaintiff's general averment that his "Website Communications" were intercepted, without more, does not satisfy the Massachusetts Rule of Civil Procedure 8 pleading standard, much less give rise to liability under the Massachusetts Wiretap Act. *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 937 (N.D. Cal. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680) ("Nor have Plaintiffs adequately alleged that Facebook obtained the contents of a communication attributable to any of them . . . . Such allegations do not suffice to 'nudge' their CIPA claim 'across the line from conceivable to plausible.'"). Thus, Plaintiff's Massachusetts Wiretap Act claim must be dismissed.

### C. Plaintiff Has Not Alleged That Interception Occurred Between The Point of Origin and The Point of Reception.

Another fatal flaw in Plaintiff's claim is his failure to credibly allege that any purported interception occurred "between the point of origin and the point of reception," as is required by the definition of "wire communication." G.L. c. 272, § 99(B)(1); *Gilday v. Dubois*, 124 F.3d 277, 292 (1st Cir. 1997) (explaining that an attempt to dial a phone number cannot amount to a wire communication because the call "cannot be *connected to the point of reception*") (emphasis in original). As such, Plaintiff cannot allege an actionable "wire communication" if the alleged interception of such a communication occurred ***after*** it was received.

Plaintiff did not allege that his interactions with the Website were intercepted "between the point of origin and the point of reception." To the contrary, Plaintiff admits that the alleged wiretapping occurs ***after*** the alleged communication. *See* Compl., ¶49 ("The wiretapping by the Session Replay Code is ongoing during the visit and intercepts the contents of these communications between Plaintiff and [BJ's] with instantaneous transmissions to the Session Replay Provider, as illustrated below, in which only 31 milliseconds were required to send a packet of event response data, which would indicate whatever the website user ***had just done.***") (emphasis added). A subsequent transmission showing what Plaintiff "had just done," even if only milliseconds ago, does not satisfy the standard. That is because an interception is traditionally understood to mean the act of "stop[pping], seiz[ing], or interrupt[ing] in progress or course before arrival." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002) (citing *Webster's Ninth New Collegiate Dictionary* 630 (1985)). Given the speed of online transmission and the fact that internet-based interactions travel nearly instantaneously, "the Wiretap Act's application to that form of electronic communication is undoubtedly limited." *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 951 (N.D. Cal. 2014). Consistent with the Massachusetts Wiretap Act, "[f]or a communication to be 'intercepted' in violation of the [Federal] Wiretap Act, it must be acquired during transmission, not while it is in electronic storage." *Id.* Plaintiff alleged no such thing. Thus, Plaintiff's claim must fail for this independent reason.

### D. <u>Plaintiff Has Not Alleged The Use of An "Intercepting Device."</u>

Even assuming, *arguendo*, that Plaintiff alleged an actionable "wire communication," Plaintiff cannot allege that such a communication was intercepted through an "intercepting device." An "intercepting device" is "any ***device*** or ***apparatus*** which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." G.L. c. 272, § 99(B)(3)

(emphasis added). Though Plaintiff alleges that the Session Replay Code is an "intercepting device" (Compl., ¶75), Plaintiff has not alleged any facts supporting that legal conclusion. In fact, his allegations mandate the opposite conclusion.

Instead of alleging that BJ's used a device or apparatus (as is required), Plaintiff alleges that the Session Replay Code is software embedded in BJ's website. *See, e.g.*, Compl., ¶39. Embedded software simply is not a "device" or "apparatus." *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d at 937 (finding that embedded cookies did not constitute a "machine, instrument or contrivance" within the confines of the analogous California Invasion of Privacy Act). BJ's alleged Session Replay Code is not a "device" or "apparatus", and at a minimum, Plaintiff fails to allege any facts supporting such a conclusion.

### E. Even if the Session Replay Code Is An "Intercepting Device", Its Use In BJ's Ordinary Course Of Business Places It Outside the Purview of the Massachusetts Wiretap Act.

Even if the Session Replay Code could be considered a "device" or "apparatus," it is not an "intercepting device" because it falls under a statutorily enumerated exception. Under the Massachusetts Wiretap Act, a device or apparatus is not an intercepting device if it is a "telephone or telegraph instrument, equipment, facility, or a component thereof [] furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business." G.L. c. 272, § 99(B)(3). If the Session Replay Code could somehow be construed to be a "device" or "apparatus," then Plaintiff's allegations make plain that the Session Replay Code must also be telephone equipment furnished to BJ's for its use in the ordinary course of BJ's business.[4]

[4] The applicability of this exception to internet-based scanning software appears to still be an open question in Massachusetts. *Marquis v. Google, Inc.*, 32 Mass. L. Rptr. 269, at *12 (Mass. Super. Ct. July 27, 2014) (on a motion for class certification, querying, without answering "whether Google's servers that routinely scan email for spam, viruses, and content for keywords but not substance fit this exception").

Of course, BJ's contends that the Massachusetts Wiretap Act cannot be extended to cover internet-based interactions. However, even if this Court were inclined to construe the Massachusetts Wiretap Act to cover Plaintiff's allegations, then the Court must similarly interpret the statutory exception "in a manner that more closely reflects the reality of the telecommunications industry as it exists today, not as it existed two decades ago." *Dillon v. Mass. Bay Transp. Autho.*, 49 Mass. App. Ct. 309, 316 (2000). To that end, the Session Replay Code need not be provided by a "common carrier" in order to satisfy the statutory exception. The *Dillon* Court explained that the telephone equipment exception has been "read to embrace devices obtained from non-telephone company sources." *Id.* On that basis, the Court found that four recording machines that were furnished by a commercial equipment manufacturer and not a "communications common carrier" fell under the exception to the Act. *Id.* Accordingly, the Session Replay Code allegedly provided by Microsoft falls within the common carrier exception. *See id.*; *see also Com. v. Hyde*, 434 Mass. at 601 n.8 (explaining that because common telephone equipment is now widely available from entities other than telephone companies, the court properly allowed the exception to apply, even though the intercepting device had been obtained from a commercial equipment manufacturer).

Further, if the Massachusetts Wiretap Act is somehow construed to apply to internet-based interactions, then the Session Replay Code surely falls within the exception because it is embedded in BJ's Website. *See O'Sullivan v. NYNEX Corp.*, 426 Mass. 261, 265 (1997) (call recording system that "was designed to operate with telephone lines and had no function outside of its application to telephone lines" fell within statutory exception); *Crosland v. Horgan*, 401 Mass. 271, 274 (1987) ("We conclude that the evidence in this case warranted a finding that the telephone extension was being used 'in the ordinary course of ... business' of the hospital so that the telephone

was not an 'intercepting device' under G.L. c. 272, § 99 B 3."); *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1249 (10th Cir. 2012) (finding ordinary course exception of Electronic Communications Privacy Act protected internet service provider ("ISP") from liability with regard to authorizing online advertising company to conduct technology test because its access was in the ordinary course of its core business as an ISP transmitting data over its equipment). Here, Plaintiff admits that the Session Replay Code was embedded on BJ's website. Compl., ¶45. It had no use beyond its connection to the Website, itself, and therefore qualifies as an exception to the definition of "intercepting device" under the Massachusetts Wiretap Act.

The only remaining question is whether BJ's utilized the Session Replay Code in its ordinary course of business. "Ordinary course of ... business" translates as "legitimate business purpose." *Dillon*, 49 Mass. App. Ct. at 319 (citing *O'Sullivan,* 426 Mass. at 266). Here, Plaintiff admits that the Session Replay Code is utilized for a legitimate business purpose—*i.e.*, to "improve customer experiences." Compl., ¶12. Likewise, Plaintiff explains that the ability to capture and use customer data is "critically important to a business's success." *Id.* at ¶13. In fact, Plaintiff states that Session Replay code is "utilized by websites for some legitimate purposes." *Id.* at ¶23.[5] Thus, the Session Replay Code is utilized for a legitimate business purpose. *See Dillon*, 49 Mass. App. Ct. at 319 ("There is no trouble accepting that MBTA had [a legitimate business] purpose in establishing a recording system; it acted upon the considerations of efficiency, safety, and sound maintenance record-keeping in a 24–hours–a–day mass transit operation that have been noted above."); *O'Sullivan*, 426 Mass. at 266 (call recording system was used in the ordinary course of business to manage the quality of services provided to customers).

[5] Though Plaintiff also claims that it "goes well beyond normal website analytics when it comes to collecting the actual contents of communications between website visitors and website," (*id.*), Plaintiff has alleged no facts supporting a conclusion that BJ's actually recorded the contents of communications between BJ's and its website visitors.

### F. To The Extent Plaintiff's Claim Is Based On "Use" or "Disclosure" It Must Fail.

Though Plaintiff's Complaint purports to focus on "interception," to the extent it is based on "use" or "disclosure," it must fail. Plaintiff did not adequately allege where or to whom BJ's allegedly disclosed Plaintiff's information or how BJ's used the information. *See MacNeill Eng'g Co. v. Trisport, Ltd.*, 59 F. Supp. 2d 199, 203 (D. Mass. 1999) (denying motion for leave to amend to add section 99(Q) claim as futile where complaint did not allege "where or to whom the disclosures were made"). Accordingly, Plaintiff has failed to plead facts supporting a violation of the Massachusetts Wiretap Act, and his claim must be dismissed.

## III. Plaintiff Failed to State a Claim for Invasion of Privacy.

Plaintiff's Count II, for invasion of privacy, should also be dismissed. G.L. c. 214, § 1B provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." To state a claim, a plaintiff must demonstrate that there was "[1] a gathering and dissemination of facts of a private nature that [2] resulted in an unreasonable, substantial or serious interference with his privacy." *Hayes v. Mirick*, 378 F. Supp. 3d 109, 116–17 (D. Mass. 2019); *see also Nelson v. Salem State Coll.*, 446 Mass. 525, 536 (2006). "The statute, essentially, proscribes 'disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate countervailing interest.'" *Ayash v. Dana–Farber Cancer Inst.*, 443 Mass. 367, 383 (2005) (quoting *Bratt v. Int'l Bus. Mach. Corp.*, 392 Mass. 508, 518 (1984)). Plaintiff has failed to allege that BJ's collected highly personal or intimate data, or that the legitimate purpose for collecting such data is not outweighed by Plaintiff's alleged right to privacy. Further, to the extent the Court finds that Plaintiff's allegations state a claim for violation of the Massachusetts Wiretap Act, his claim for Invasion of Privacy must be dismissed as duplicative.

### A. <u>**The Website Data Allegedly Collected By BJ's Is Not Highly Personal or Intimate.**</u>

To sustain a claim for invasion of privacy, the invasion must be both unreasonable and substantial or serious. *See Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 409 Mass. 514, 517–19 (1991). The routine collection of the data that Plaintiff defines as "Website Communications" is simply not the "highly personal or intimate" facts that the Invasion of Privacy Statute is designed to protect. *See Massie v. Gen. Motors LLC*, No. CV 21-787-RGA, 2022 WL 534468, at *5 (D. Del. Feb. 17, 2022) ("Plaintiffs do not have a reasonable expectation of privacy over the anonymized data captured by the Session Replay software at issue here."); *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1086 (C.D. Cal. 2021) (considering claim based on session replay software, and explaining that "courts have been less willing to find that users have a cognizable privacy interest in browsing data collected only while users interact with the website of the defendant company."); *Yale*, 2021 WL 1428400, at *3 ("The plaintiff does not plausibly plead a violation of her right to privacy under the California Constitution because she did not plausibly plead wiretapping."); *In re iPhone Application Litig.*, 844 F.Supp.2d 1040, 1063 (N.D. Cal. 2012) (holding that the disclosure to third parties of unique device identifier number, personal data, and geolocation information did not constitute an egregious breach of privacy); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012) (allegations related to disclosure of "LinkedIn ID and the URL of the LinkedIn profile page that the user viewed (which in the aggregate discloses a user's browsing history among LinkedIn profiles)" was insufficient "to establish a highly offensive disclosure of information or a 'serious invasion' of a privacy interest"); *Yunker v. Pandora Media, Inc.*, No. 11-CV-03113 JSW, 2013 WL 1282980, at *14–15 (N.D. Cal. Mar. 26, 2013) (obtaining personally identifiable information and providing that information to

advertising libraries for marketing purposes was "not sufficient to allege that Pandora's conduct constitutes an egregious breach of social norms").

Here, of course, Plaintiff fails to specifically plead what data was even allegedly captured, and Plaintiff's conjecture that the data was personal or intimate is not enough to state a claim. *Doe v. CVS Pharmacy, Inc.*, No. 2184CV0807BLS2, 2021 WL 5630358, at *1 (Mass. Super. Ct. Aug. 3, 2021) ("Doe does not adequately allege any injury to herself. While she contends that alleged disclosure on the CVS website and phone application to her of others' PHI and PI makes it "reasonable" to assume her PHI and PI were similarly disclosed, she alleges no facts to show that this is the case and that she was actually injured."). Thus, Plaintiff's claim must be dismissed.

**B. <u>Plaintiff Admits That BJ's Had a Countervailing Legitimate Interest In Such Collection.</u>**

In determining whether a defendant committed an unreasonable intrusion under the Invasion of Privacy Act, the extent to which the defendant violated the plaintiff's privacy interests is balanced against any legitimate purpose the defendant may have had for the intrusion. *See O'Connor v. Police Comm'r of Bos.*, 408 Mass. 324, 330 (1990); *Bratt*, 392 Mass. at 510 (1984). As explained above, Plaintiff did not have any actionable privacy interests in the data allegedly collected by the Session Replay Code. However, even if he has some privacy interest, it is surely outweighed by BJ's legitimate business interests, which Plaintiff recites throughout his Complaint. *See, e.g.*, Compl., ¶¶12, 13, 22, 23. Consequently, even if Plaintiff has alleged any sort of invasion of privacy, his concession that the alleged data is procured in the pursuit of BJ's legitimate business purposes renders his claim subject to dismissal.

### C. If Plaintiff's Wiretap Act Claim Proceeds, His Invasion of Privacy Claim Cannot.

To the extent Plaintiff's allegations fall within the confines of the Massachusetts Wiretap Act, Plaintiff cannot base an Invasion of Privacy Act claim on the same allegations. *Christensen v. Cox*, No. SUCV201701635BLS1, 2017 WL 7053911, at *7 (Mass. Super. Ct. Nov. 21, 2017) ("Finally, plaintiffs' claim in Count VI that the recording of the telephone call was a violation of G.L.c. 214, § 1B. That claim is dismissed because the Legislature has given persons whose conversations are illegally intercepted a specific and exclusive statutory remedy under G.L.c. 272, § 99(Q)."); *see also Tedeschi v. Reardon*, 5 F. Supp. 2d 40, 46 (D. Mass. 1998) ("Tedeschi's second claim, that Reardon's alleged wiretapping amounted to an invasion of his privacy, fails for the reason that the Legislature has given persons whose conversations are illegally intercepted a specific and exclusive statutory remedy."). Accordingly, Plaintiff's Count II should be dismissed if Plaintiff's Count I remains.

## CONCLUSION

Plaintiff has not alleged any facts to support a finding that BJ's use of embedded Session Replay Code constitutes criminal wiretapping or a substantial and unreasonable violation of privacy. Plaintiff's attempt to hold website operators liable for the routine use of commercially available software must be rejected and his claims must be dismissed.

WHEREFORE, by and through its counsel, Defendant BJ's Wholesale Club, Inc. respectfully requests that the Court grant this Motion and dismiss Plaintiff's Complaint with prejudice.

Respectfully Submitted,

FOLEY & LARDNER LLP

*/s/ Geoffrey M. Raux*

Geoffrey M. Raux (BBO # 674788)
Miranda D. Curtis (BBO # 709084)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Phone: 617-342-4000
Fax: 617-342-4001
graux@foley.com
mcurtis@foley.com

Kevin A. Reck, *pro hac vice forthcoming*
Emily J. Lang, *pro hac vice forthcoming*
FOLEY & LARDNER LLP
301 East Pine Street, Suite 1200
Orlando, FL 32801
Phone: 407-244-3269
Fax: 407-648-1743
kreck@foley.com
elang@foley.com

*Attorneys for Defendant BJ'S WHOLESALE CLUB, INC.*

Dated: January 24, 2023

**CERTIFICATE OF SERVICE**

I, Miranda D. Curtis, hereby certify that on January 24, 2023 a copy of the foregoing document was served by U.S. mail to:

Joseph P. Guglielmo
Carey Alexander
Ethan S. Binder
Scott+Scott Attorneys at Law LLP
The Helmsley Building
230 Park Avenue, 17th Fl.
New York, NY 10169
jguglielmo@scott-scott.com
calexander@scott-scott.com
ebinder@scott-scott.com

Brian C. Gudmundson
Michael J. Laird
Rachel K. Tack
Zimmerman Reed LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
rachel.tack@zimmreed.com

*/s/ Miranda D. Curtis*
Miranda D. Curtis

15

COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**

**SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**

JOE ALVES, individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BJ'S WHOLESALE CLUB, INC.,

Defendant.

CIVIL ACTION NO. 2284CV02509-BLS1

# DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

**I.** BJ's' Alleged Conduct Does Not Violate The Massachusetts Wiretap Act. ...................... 1

**II.** Plaintiff's Alleged Keystrokes Do Not Contain "Content." ............................................ 3

**III.** The Alleged Interception Was Not Between the Point of Origin and Reception. .............. 5

**IV.** Session Reply Code Is Not An Intercepting Device. ....................................................... 5

**V.** The Session Replay Code Falls Under The Statutory Exception. ...................................... 7

**VI.** If Plaintiff's Claims Are Based on Use Or Disclosure, They Are Not Pled With Requisite Particularity.......................................................................................................... 7

**VII.** Plaintiff's Invasion of Privacy Claim Must Be Dismissed. ............................................. 8

**VIII.** Plaintiff's Invasion of Privacy Claim Cannot Proceed. ................................................ 10

Defendant BJ's Wholesale Club, Inc. ("BJ's" or "Defendant"), hereby replies in support of its Motion to Dismiss (the "Motion") the Complaint filed by Joe Alves ("Plaintiff").

## I. BJ's' Alleged Conduct Does Not Violate The Massachusetts Wiretap Act.

Plaintiff goes to great lengths to try to fit the alleged use of "Session Replay Code" within the confines of G.L. c. 272 § 99(Q) (the "Massachusetts Wiretap Act"). As explained in the Motion, Plaintiff's alleged internet-based interactions with BJ's Website are not covered by the plain language of the Massachusetts Wiretap Act. Mot. at §II(A). Instead of addressing the statutory language, Plaintiff boldly claims that "Courts have held that the unbridled use of Session Replay Code to secretly record website visitors' communications is a violation of state wiretapping laws," citing *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121 (3d Cir. 2022), in alleged support. Opp. at 1. Plaintiff greatly misstates the holding in *Popa.* The *Popa* Court considered a claim under Pennsylvania's Wiretap Law, which explicitly governs "electronic communications." 52 F.4th at 125. The *Popa* Court did not hold that Session Replay Code is governed by state wiretapping laws. Rather, the Court considered an order granting summary judgment in favor of defendant based on narrow issues of consent and the place of alleged interception. *Id.* at 133. The trial court in *Popa* did ***not*** hold that the alleged use of Session Replay Code violated Pennsylvania's Wiretap Act; it merely found that summary judgment was warranted even ***if*** such alleged interception violated the law. 544 F. Supp. 3d 535, 547 (W.D. Pa. 2021). The Third Circuit Court of Appeals reversed, finding that genuine issues of material fact remained on these narrow issues. 52 F.4th at 133.

Contrary to Plaintiff's assertions, his alleged ***internet***-based interactions do not constitute communications by the aid of wire, cable or other like connection, so as to fall within the purview of the Massachusetts Wiretap Act. Plaintiff claims that a case interpreting the term "wire communication facility" under 18 U.S.C. § 1081, which is a statute governing gambling, supports

the conclusion that his keystrokes are "wire communications" under the Massachusetts Wiretap Act. Opp. at 4 (citing *United States v. Lyons*, 740 F.3d 702, 716 (1st Cir. 2014)). Plaintiff is wrong. The gambling statute interpreted in *Lyons* defines a "wire communication facility" as "any and all instrumentalities, personnel, and services (among other things, the receipt, forwarding, or delivery of communications) used or ***useful in the transmission of writings, signs, pictures, and sounds of all kinds*** by aid of wire, cable, or other like connection." 18 U.S.C. § 1081 (emphasis added). In concluding that the internet falls within that definition, the *Lyons* Court explained that "the ***internet is used and useful in the transmission of writings.***" *Lyons*, 740 F.3d at 716 (emphasis added). The term "wire communication" in the Massachusetts Wiretap Act does not contain the "transmission of writings" language relied upon in *Lyons*. *See* G.L. c. 272, § 99 (defining "wire communication" as "communication made in whole or in part through the use of facilities ***for the transmission of communications*** by the aid of wire, cable, or other like connection between the point of origin and the point of reception").

Plaintiff has not alleged a "wire communication," but instead alleges that he used the portion of his phone that acted like a computer to access BJ's Website. This is insufficient. *See Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1135 (E.D. Cal. 2021) (California's analogous Wiretap Act does not govern "the portion of the iPhone that functions as a computer, not the phone"). Plaintiff attempts to distinguish *Mastel* by arguing that it involved an iPhone application installed on a phone. Opp. at 4. That distinction is unavailing, as Plaintiff has failed to credibly explain how the application at issue in *Mastel* differed from the web-browser application Plaintiff allegedly utilized to access BJ's Website.

Likewise, the alleged interception of "mouse movements, clicks, keystrokes, [and] URLs," (Compl., ¶1), is not an interception of a "wire communication," as they are not communications at

all. Plaintiff does not allege that BJ's intercepted emails (like those in *Marquis v. Google*), text messages (like those in *Com. v. Moody*) or any other "communications." Nonetheless, Plaintiff relies on *Rich v. Rich,* 2011 WL 3672059, at *6 (Mass. Super. Ct. July 8, 2011), to claim that Massachusetts courts have held that software that "records all keystrokes typed into a computer" falls within the definition of "wire communication." Opp. at 5. Unlike the Session Replay Code alleged here, *Rich* considered keylogger software installed by the Plaintiff's ex-husband on her computer that intercepted ***emails*** as she typed them—*i.e.,* classic "communications." No such allegation is present here. Thus, the keylogger utilized to intercept emails in *Rich* is not analogous to the alleged Session Replay Code purportedly utilized to intercept mouse clicks and other alleged interactions with BJ's Website.

## II. Plaintiff's Alleged Keystrokes Do Not Contain "Content."

In the same vein, Plaintiff has failed to credibly explain how the Session Replay Code intercepts "contents" of communications. Plaintiff attempts to distance himself from the vast body of case law finding that mouse clicks, URLs, and the like do not contain "content". In doing so, Plaintiff correctly points out that the Massachusetts Wiretap Act defines content to include "information ***concerning the identity*** of the parties ***to such communication.***" Opp. at 6 (citing G.L. c. 272, § 99(B)(5) (emphasis added)). While information concerning the identity of the parties may amount to content, there still must be an underlying ***communication***.

Plaintiff points to case law analyzing pen registers to avoid authority interpreting federal and other state wiretapping acts. Plaintiff explains that in *Smith v. Maryland,* the United States Supreme Court noted that a pen register did not acquire "contents," so as to implicate Fourth Amendment concerns; but, in *Dist. Att'y v. New England*, a pen register did acquire "contents" under the Massachusetts Wiretap Act. However, the decision in *Dist. Att'y for Plymouth Dist. v.*

*New England Tel. & Tel. Co.*, 379 Mass. 586, 592 (1980), was not based on the difference in the definition of "contents" but rather on the fact that the federal wiretap act at that time defined "intercept" as "relating only to the 'aural acquisition of the contents of any wire or oral communication.'" Moreover, the Court in *New England Tel. & Tel.* did not consider whether the installation of a pen register violated the Massachusetts Wiretap Act, but rather, whether the Court had authority to compel a telephone company to assist in installing such a device for purposes of an ongoing criminal investigation. Thus, *New England Tel. & Tel.* cannot be interpreted to support the broad proposition that identity equals "contents," absent an underlying communication.

Indeed, other state wiretap acts defining "contents" in the same way as the Massachusetts Wiretap Act have concluded that pen registers do not acquire contents. *See State v. Miller*, 449 A.2d 1065, 1067–68 (Del. Super. Ct. 1982) (finding that a device recording in-coming and out-going telephone numbers did not "provide[] any information concerning the identity of the parties or the existence, substance, purport or meaning of the communications monitored");[1] *United States v. New York Tel. Co.*, 434 U.S. 159, 167 (1977) ("Indeed, a law enforcement official could not even determine from the use of a pen register whether a communication existed. These devices do not hear sound. They disclose only the telephone numbers that have been dialed—a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, ***their identities***, nor whether the call was even completed is disclosed by pen registers.") (emphasis added).

Further, a pen register installed on a phone line to track incoming and outgoing calls is much different than the Session Replay Code at issue here, which allegedly "records" the IP

[1] Delaware's Wiretap Act similarly defines "contents," when used with respect to any wire, oral or electronic communication, to include "any information concerning the identity of the parties to the communication or the existence or substance of that communication." Del. Code Ann. 11, § 2401(4).

address of the individual interacting with BJ's. *See United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (explaining that "e-mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit"). For this reason, the case law relied upon by Plaintiff interpreting the collection of communications does not support the conclusion that keystrokes, clicks, mouse movements, URLs and searches made by Plaintiff within BJ's Website constitute "content."[2]

**III. <u>The Alleged Interception Was Not Between the Point of Origin and Reception.</u>**

Plaintiff next claims that he sufficiently alleged that his "communications" were intercepted contemporaneously with transmission. Plaintiff relies on *In re Pharmatrak, Inc.*, 329 F.3d 9, 22 (1st Cir. 2003), a case declining to "enter the debate over the existence of a real-time requirement" when analyzing an "automatic routing program" that acquired communications contemporaneously with their transmission. *See* Opp. at 10. *Pharmatrak* has no bearing here, as it did not even address the issue. Regardless, an automatic routing program is vastly different than the capture of information after it reaches the point of reception, which is what Plaintiff alleges in his Complaint. The Session Replay Code is allegedly embedded on BJ's Website. Compl., ¶ 1. For the Session Replay Code to "intercept" any alleged communication, it would necessarily have to do so after the "communication" reached its destination (BJ's Website). Thus, it did not occur between the point of origin and point of reception.

**IV. <u>Session Reply Code Is Not An Intercepting Device.</u>**

Plaintiff boldly claims that "Massachusetts law is clear that software that can log keystrokes" is an "intercepting device" under the Massachusetts Wiretap Act. Opp. at 11. BJ's has

---

[2] Plaintiff again relies on *Rich* (interpreting the interception of emails), and *Byars v. Goodyear Tire & Rubber Co.*, 2023 WL 1788553, at *5 (C.D. Cal. Feb. 3, 2023) (considering allegations that plaintiff communicated with Goodyear's website via its "chat feature").

uncovered no Massachusetts case law interpreting Session Replay Code within the context of the Massachusetts Wiretap Act, and it appears Plaintiff has not either. Instead, Plaintiff relies again on *Rich,* which considered a keylogger device installed on a *computer* to intercept emails—not cookies embedded on a website that track mouse clicks. Plaintiff further cites to federal case law interpreting other states' wiretap acts, which Plaintiff has already argued should not govern here. Opp. at 11 (citing *Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108 (W.D. Pa. 2019), and *Makkinje v. Extra Space Storage, Inc.*, 2022 WL 80437, at *1 (M.D. Fla. Jan. 7, 2022)). In *Popa*, the Court did not hold that Session Replay Code is a "device," but merely deferred ruling on the issue, without addressing the authority finding that a cookie is not a "device." In doing so, the Court stated: "While the statutory definitions of 'device' and 'electronic communication' are broad, they are not limitless. They may or may not include the type of electronic data collection complained of by Popa." *Popa*, 426 F. Supp. 3d at 117.

*Makkinje* is also inapposite. There, the Court declined to follow the many cases finding that Session Replay Code is not a device that intercepts communications, because the plaintiff alleged that "Defendant's use of session replay software during her visit to its website recorded more than just her non-substantive browsing movements." 2022 WL 80437, at *2. In that context, the Court found that "[t]hough Defendant may, in fact, be correct that the FSCA does not apply to a commercial website's recording of live chat communications via session replay software, that determination is more appropriately addressed at the summary judgment stage." *Id.*[3] Here, Plaintiff has not alleged that BJ's wiretapped transcripts of live chat communications. Plaintiff merely alleges that BJ's embedded a cookie on its own website (not, for example, on Plaintiff's computer),

[3] The *Makkinje* Court relied on *United States v. Barrington*, 648 F.3d 1178, 1184 (11th Cir. 2011), for the proposition that software can equate to a "device." *Barrington* considered a keylogger software installed on various ***computers***, which covertly recorded employees' usernames and passwords and automatically transmitted them to defendant's personal email address. This is unlike the Session Replay Code allegedly embedded on BJ's' own ***website***.

that recorded clicks from Plaintiff to BJ's. Plaintiff cites no authority supporting the conclusion that a cookie is a "device."

## V. The Session Replay Code Falls Under The Statutory Exception.

Plaintiff primarily opposes BJ's contention that the alleged use of Session Replay Code falls within a statutory exception by arguing that the determination should be made at the summary judgment stage. However, Massachusetts Courts recognize that "if it is evident from the allegations of the complaint alone that the defendant is entitled to an affirmative defense, the matter may be decided by means of a motion to dismiss." *Fleming v. Nat'l Union Fire Ins. Co.*, 445 Mass. 381, 389–90 (2005) (internal alterations omitted); *see also Cavanagh v. Cavanagh*, 396 Mass. 836, 838 (1986) ("[I]f the complaint shows on its face the existence of an affirmative defense, the complaint does not state a claim upon which relief can be granted.").

Applying the exception set forth in G.L. c. 272, §99(B)(3) at this stage, and in this context, would not "undermine the effectiveness and reach of the Massachusetts Wiretap Statute," as Plaintiff claims. Opp. at 13. Here, "Plaintiff['s] own allegations make clear that the activities at issue here, concerning [BJ's] core targeted advertising, is within its business' ordinary course." *In re Google, Inc. Priv. Pol'y Litig.*, 2013 WL 6248499, at *10 (N.D. Cal. Dec. 3, 2013) (granting motion to dismiss based on ordinary course exception).

## VI. If Plaintiff's Claims Are Based on Use Or Disclosure, They Are Not Pled With Requisite Particularity.

This section of BJ's Motion makes clear that *if* Plaintiff bases his claims on use or disclosure, they were not sufficiently pled. Plaintiff appears to concede that his claim is based on interception. Opp. at 15. But because Plaintiff goes on to claim that he alleged to whom purported communications were allegedly disclosed, BJ's will respond.

First, Plaintiff claims that alleging that BJ's sent information to "various Session Replay Providers" sufficiently alleges disclosure. Opp. at 15. It does not. Plaintiff does not define "Session Replay Providers" other than to state that they are third-party vendors. Next, Plaintiff argues that the screenshots in paragraphs 47 and 48 of his Complaint depict to whom BJ's allegedly disclosed communications. Opp. at 15. Those paragraphs state information by way of alleged "example" and do not specifically state that BJ's disclosed ***Plaintiff's*** communications to Microsoft Clarity, as allegedly shown in the screenshots.

With respect to "use", Plaintiff argues that paragraphs 2, 12, and 27 of his Complaint sufficiently allege use. Again, they do not. Those allegations relate to the use of Session Replay Code, generally—not how BJ's allegedly utilized Plaintiff's information. Accordingly, Plaintiff failed to allege "use" and "disclosure" with the requisite particularity.

**VII. <u>Plaintiff's Invasion of Privacy Claim Must Be Dismissed.</u>**

Instead of responding to the vast body of case law cited in BJ's Motion supporting the fact that Plaintiff's purported "Website Communications" were not highly personal and intimate, Plaintiff relies on inapposite case law which only further establishes that Plaintiff has failed to allege any sort of invasion of privacy. First, Plaintiff relies on *McLaughlin v. Meehan*, 2018 WL 1041371, at *10 (Mass. Super. Ct. Jan. 19, 2018), to claim that BJ's tracked "Plaintiff's personal thoughts, ideas, and communications, which may have included sensitive data." Opp. at 17. No such thing is alleged in Plaintiff's Complaint—nor could it be. *McLaughlin* considered a "person's private computer files, including his email accounts." 2018 WL 1041371, at *10. That is far different from the alleged tracking of "clicks." Plaintiff also relies on *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 604 (9th Cir. 2020), to claim that individuals have a reasonable expectation of privacy in the collection of swaths of information. Opp. at 17. However, that statement in *Facebook* was premised on the fact that individuals have a reasonable expectation of

privacy in collections of information that reveal "familiar, political, professional, religious, and sexual associations." 956 F.3d at 604 n.7. To the contrary, Plaintiff does not have a reasonable expectation of privacy in the action he took on BJ's Website, which merely communicated to the Website which page to populate on Plaintiff's screen. *Forrester*, 512 F.3d at 510.

Plaintiff cannot dispute that BJ's did not tap Plaintiff's personal cell phone to look at his emails, personal text messages, or personal computer files. So, in response, Plaintiff claims that it does not matter *what* BJ's collected, but rather *how* BJ's allegedly collected Plaintiff's information. Opp. at 17. In doing so, Plaintiff relies on two decisions from the Third Circuit Court of Appeals[4] and ignores black letter Massachusetts law, which requires that Plaintiff allege a "disclosure of facts about an individual that are of a highly personal or intimate nature." *Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 518 (1984).

Further, any alleged intrusion was not unreasonable. Though reasonableness *generally* presents a question of fact, Plaintiff's allegations enable the Court to decide this question on a motion to dismiss. Here, Plaintiff specifically pleads the legitimate business interests supporting the alleged collection of data. *See, e.g.*, Compl., ¶¶12, 13, 22, 23. When compared to the fact that Plaintiff has not alleged the collection of *any* data that is "highly personal or intimate," the Court should conclude as a matter of law that Plaintiff has not stated a claim. *See Popa*, 426 F. Supp. 3d at 122–23 (dismissing intrusion upon seclusion claim because "[t]he act of collecting Popa's keystrokes, mouse clicks, and PII is simply not the type of highly offensive act to which liability can attach"). And, although Plaintiff includes conclusory allegations regarding the objectionable

[4] Plaintiff relies on *In re Nickelodeon Consumer Priv. Litig.*, 2014 WL 3012873 (D.N.J. July 2, 2014) and *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125 (3d Cir. 2015). These cases are distinguishable. In *Nickelodeon,* plaintiffs alleged that defendant collected children's information, despite stating that it "would not collect any personal information about your kids." 827 F.3d at 268–69. Further, in *Google,* the plaintiffs alleged that defendants exploited loopholes in cookie blockers in order to install trackers to collect information. 806 F.3d at 132.

nature of BJ's alleged conduct, that is insufficient to support his claim. *In re Nickelodeon*, 2014 WL 3012873, at *19 (allegation that intrusion "would be highly offensive to a reasonable person" was "entirely conclusory, and thus properly disregarded on a motion to dismiss" … "[Plaintiff] does not explain factually how Defendants' collection and monetization of online information would be offensive to the reasonable person, let alone exceedingly so.").

**VIII. <u>Plaintiff's Invasion of Privacy Claim Cannot Proceed.</u>**

Plaintiff's Count II is preempted by his Massachusetts Wiretap Act claim. Mot., at 17 (citing *Christensen v. Cox*, 2017 WL 7053911, at *7 (Mass. Super. Ct. Nov. 21, 2017), and *Tedeschi v. Reardon*, 5 F. Supp. 2d 40, 46 (D. Mass. 1998)). Plaintiff attempts to distinguish *Christensen* and *Tedeschi* by arguing that their holdings are limited to wiretapped phone calls. Opp. at 20 n.4. The language of the opinions does not support any such conclusion. If the legislature provided a Plaintiff a cause of action for the interception that purportedly occurred here (which BJ's disputes), then Plaintiff cannot proceed with his Invasion of Privacy claim, and the Court should dismiss Count II pursuant to *Christensen* and *Tedeschi*.[5]

WHEREFORE, by and through its counsel, Defendant BJ's Wholesale Club, Inc. respectfully requests that the Court grant this Motion and dismiss Plaintiff's Complaint with prejudice.

---

[5] Plaintiff relies on a lone opinion denying a motion to dismiss directed to similar claims, where the defendant did not argue that plaintiff's invasion of privacy claim was preempted by its Wiretap Act claim. Opp. at 20 (citing *Heffernan v. Hashampour*, 2009 WL 6361870, at *3 (Mass. Super. Ct. Dec. 19, 2009)). Accordingly, *Heffernan* did not address the issue of preemption, and its holding is therefore inapplicable here.

Respectfully Submitted,

FOLEY & LARDNER LLP

*/s/ Geoffrey M. Raux*

Geoffrey M. Raux (BBO # 674788)
Miranda D. Curtis (BBO # 709084)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Phone: 617-342-4000
Fax: 617-342-4001
graux@foley.com
mcurtis@foley.com

Kevin A. Reck, *admitted pro hac vice*
Emily J. Lang, *admitted pro hac vice*
FOLEY & LARDNER LLP
301 East Pine Street, Suite 1200
Orlando, FL 32801
Phone: 407-244-3269
Fax: 407-648-1743
kreck@foley.com
elang@foley.com

*Attorneys for Defendant BJ'S WHOLESALE CLUB, INC.*

Dated: March 15, 2023

**CERTIFICATE OF SERVICE**

I, Miranda D. Curtis, hereby certify that on March 15, 2023 a copy of the foregoing document was served by electronic mail to:

Joseph P. Guglielmo
Carey Alexander
Ethan S. Binder
Scott+Scott Attorneys at Law LLP
The Helmsley Building
230 Park Avenue, 17th Fl.
New York, NY 10169
jguglielmo@scott-scott.com
calexander@scott-scott.com
ebinder@scott-scott.com

Brian C. Gudmundson
Michael J. Laird
Rachel K. Tack
Zimmerman Reed LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
rachel.tack@zimmreed.com

*/s/ Miranda D. Curtis*
Miranda D. Curtis