# EXHIBIT E-03

Exhibit 1

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| KATHLEEN VITA,<br><br>For herself and the Class,<br><br>v.<br><br>BETH ISRAEL DEACONESS MEDICAL CENTER, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION No. 2384CV00480<br><br>**JURY TRIAL DEMANDED** |

**[PROPOSED] AMENDED COMPLAINT**

Plaintiff Kathleen Vita ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendant, Beth Israel Deaconess Medical Center, Inc. ("BIDMC"), including those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information").

2. Specifically, BIDMC aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by BIDMC (the "BIDMC Website"). BIDMC assisted in the interception of these communications by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called "tracking technologies." The Plaintiff's and Class Members' communications with BIDMC were secretly and contemporaneously intercepted, recorded, and transmitted to these third parties

without their knowledge or consent whenever they visited any page of the BIDMC Website, including many pages that permitted third parties to intercept Private Information, including, without limitation, requests for information on particular conditions and treatments, keyword searches, doctor searches, appointment requests, bill payments, and access to the website's patient portal.

3. BIDMC actively aided the secret interceptions of healthcare consumers' communications with their website by injecting hidden code into the website. During the loading of webpages on the BIDMC Website, BIDMC assists Google, Facebook, and others to intercept communications surreptitiously. Those interceptions enabled the third parties to know that a specific patient was seeking confidential medical care. That recipient, in turn, sells Plaintiff's and Class Members' Private Information to marketers who target Plaintiff and Class Members with online advertisements based on communications obtained via tracking technologies.

4. BIDMC did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the BIDMC Website, nor did BIDMC seek or obtain their consent for such interception. On the contrary, BIDMC **falsely** told healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

5. BIDMC owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, BIDMC assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

6. Despite the stigmas that, unfortunately, are so often associated with certain health issues and treatments, BIDMC chose to put its business interests over the privacy of its patients. The unilateral disclosure of users' Private Information in this manner violated the Health Insurance

Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 42 U.S.C.), among other statutory and common laws.

7. As described more fully below, Plaintiff and Class Members have suffered injury as a result of BIDMC's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their Private Information.

8. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. On October 31, 2023, the Massachusetts Superior Court denied BIDMC's motion to dismiss, rejecting BIDMC's arguments that (i) the Massachusetts Wiretap Act should be limited to human-to-human conversation; (ii) the interceptions were not secret; and (iii) the interceptions were made in the ordinary course of BIDMC's business. The Superior Court, however, reported its decision denying the motion to dismiss for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of the case. On October 24, 2024, the Supreme Judicial Court reversed the Superior Court's order denying the motion to dismiss, holding that the Massachusetts Wiretap Act was ambiguous as to whether it encompassed the type of electronic website communications Plaintiff described in her original complaint. *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the Massachusetts act) to

unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

9. The Supreme Judicial Court, although reversing the Superior Court, did not direct that judgment be entered, recognizing, at least implicitly, that Plaintiff might amend her complaint to assert other claims the Supreme Judicial Court indicated were potentially cognizable based on the facts Plaintiff had alleged. Plaintiff now amends her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, and several claims under common law.

10. The ECPA, like the Massachusetts Wiretap Act, prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. Here, BIDMC intercepted the electronic communications at issue in a manner that violated HIPAA. The ECPA thus provides a private remedy for BIDMC's interception of electronic communications, enforceable against both the intercepting party **and** any party that aids such an interception.

11. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the BIDMC Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common law claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

## PARTIES

12. Plaintiff is a resident of Revere, Massachusetts. Plaintiff's husband is a patient at BIDMC. Plaintiff regularly used the BIDMC Website to (i) obtain information about BIDMC's

doctors (including their credentials and backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures, both for herself and her husband; and (iii) obtain and review her husband's medical records through the website's patient portal.

13. As described below, BIDMC implemented tracking technologies that intercepted communications between BIDMC and healthcare consumers on nearly every page of the BIDMC website. The webpages Plaintiff visited on the BIDMC website were among the webpages on which BIDMC embedded code for various tracking technologies, including Meta Pixel, Google Analytics, Google Doubleclick, Siteimprove Analytics, and Marchex.io. *See* ¶¶ 94-97, *infra* (tracking technologies embedded on pages relating to doctors); ¶¶ 78-83, *infra* (tracking technologies embedded on pages about conditions and medical procedures); ¶¶ 107-109, *infra* (tracking technologies embedded on PatientSite patient portal, which Plaintiff accessed to obtain medical records).

14. Neither Plaintiff nor her husband consented to our authorized use of Private Information by third parties or BIDMC enabling third parties to access and use such Private Information.

15. Defendant Beth Israel Deaconess Medical Center, Inc. is a corporation that operates in Boston, Massachusetts. Its functions include providing healthcare services primarily at its Boston, Massachusetts campus. BIDMC maintains and controls the content of the BIDMC Website.

## JURISDICTION

16. The exercise of personal jurisdiction over BIDMC is proper according to M.G.L. c. 223 § 3 because, among other things, BIDMC is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of BIDMC's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

**BIDMC and Its Website**

17. BIDMC operates a hospital in Boston, Massachusetts. BIDMC offers inpatient and outpatient care to residents near Boston and surrounding communities in eastern Massachusetts. BIDMC provides healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, obstetrics and gynecology, oncology, and trauma care.

18. BIDMC maintains the BIDMC Website for its hospital, found at https://www.bidmc.org/. Through that website, healthcare consumers can obtain information about the services BIDMC provides, including information about doctors, services, and treatments provided by BIDMC for particular medical conditions.

19. The BIDMC Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The BIDMC Website provides general information about BIDMC.

(b) The BIDMC Website provides information about healthcare services provided at BIDMC, communicated through service-specific pages for a range of services such as "Obstetrics and Gynecology," "Cancer Center," "Digestive Disease Center," and "Neurology," among many others.

(c) The BIDMC Website provides substantive information about specific health conditions through the website's "Conditions & Treatments" section, which presents a comprehensive database of conditions BIDMC treats, including symptoms and causes of those conditions, diagnoses and treatments, and programs and services offered by BIDMC.

(d) The BIDMC Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(e) The BIDMC Website permits healthcare consumers to book an appointment online through the website.

(f) The BIDMC Website permits healthcare consumers to access and pay bills online.

(g) The BIDMC Website lets healthcare consumers access their private medical information online through the PatientSite patient portal.

20. Because the BIDMC Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical conditions, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**Reasonable Expectations of Users of the BIDMC Website**

21. Healthcare consumers have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the BIDMC Website.

22. Users of healthcare-related websites such as the BIDMC Website have a legitimate expectation and understanding that their communications with BIDMC through the website will be private. They also have a legitimate expectation that healthcare providers such as BIDMC will not share with third parties their communications with BIDMC without their consent.

23. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as BIDMC from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as BIDMC from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

24. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including BIDMC, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

25. The expectations and understanding of users of the BIDMC Website are informed by what BIDMC tells them about how it handles their personal information.

26. The BIDMC Privacy Policy states:

> Beth Israel Deaconess Medical Center (BIDMC) is committed to protecting your privacy. The BIDMC website allows you to visit most areas without identifying yourself or providing personal information. For those areas where you elect to provide identifiable information, we assure you that we make every effort to protect your privacy.

(emphasis added). This was false. As explained in greater detail below, BIDMC injected hidden code into its website that permitted third parties such as Google and Facebook to contemporaneously and surreptitiously intercept the contents of healthcare consumers' communications with the BIDMC Website. That hidden code tracked the user's IP address (i.e., the user's unique identity on the internet), connected the IP address to the user's browsing activity, and shared that same information with third parties such as Google and Facebook. Those third parties can then connect the user's intercepted communications with their real-world identities. It was, therefore, false to state that the "website allows you to visit most areas without identifying yourself," as Google and Facebook can and do identify users on the website and associate their identities to the website users' communications with the website. Google and Facebook can then use the communications to serve personalized advertising to those individuals.

27. The same Privacy Policy also states:

> Beth Israel Deaconess Medical Center routinely gathers data on website activity, such as how many people visit the site, the pages they visit, where they come from, how long they stay, etc. **<u>The data is collected on an aggregate, anonymous basis, which means no personally identifiable information is associated with the data</u>**. This data helps us improve site content and overall usage. **<u>This information is not shared with other organizations.</u>** Except for authorized law enforcement investigations or other facially valid legal processes, **<u>we will not share any information we receive with any outside parties.</u>**

(emphasis added) The highlighted segments above were entirely false. As explained in greater detail below, data on website activity was **<u>not</u>** collected only on an aggregate basis. Instead, the data was

recorded, intercepted, and collected on an individual basis. And, that data was **not** collected on an anonymous basis. Instead, Google and Facebook can and do associate website users' communications with the BIDMC Website with particular individuals known to Google and Facebook (many by name), which information Google can then use to serve personalized advertisements upon particular individuals. Finally, when BIDMC said "[t]his information is not shared with other organizations," this too was false. As discussed below, information has been shared with Google, Facebook, and various other third parties.

28. Although the BIDMC Website, since approximately November 2021, has included a pop-up on its website that references the use of "cookies and other tools to enhance your experience on the website," the pop-up links to the Privacy Policy discussed in the paragraphs above, which, as noted, presented false information that failed to disclose that BIDMC assists third parties such as Google and Facebook to secretly and contemporaneously intercept website users' communications with the BIDMC Website.

29. In short, healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by BIDMC's false and deceptive statements on the BIDMC Website. The interceptions of website users' communications with BIDMC were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third Parties Offering Tracking Technologies**

30. Plaintiff describes in this complaint various tracking technologies implemented on the BIDMC Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with BIDMC. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept

and record the contents of Class Members' internet communications with BIDMC and the purposes for which interceptions are made.

31. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

32. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

33. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

34. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

35. Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

[1] Facebook rebranded its parent company as "Meta" in October 2021.

36. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

37. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[2]

38. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

39. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals, whether or not they have a Google account.

40. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

41. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website.

---

[2] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

**Website Tracking Technologies on the BIDMC Website**

42. BIDMC injected hidden code into the BIDMC Website that permitted third parties to contemporaneously intercept healthcare consumers' communications with BIDMC. The tracking technologies permitted third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This included, for example, associating the content of the user's communications with BIDMC with the website user's Facebook profile.

43. These tracking technologies transmitted to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and BIDMC, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

44. BIDMC has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

45. Before describing how such technologies work, it is important to first define some basic technological terms.

46. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

47. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the BIDMC Website, as of the time of this complaint, is 134.174.104.188. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

48. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the BIDMC Website is https://www.bidmc.org/. Numerous URLs also point to specific pages on that website. Sometimes, the text contained in a URL will reveal information about the particular webpage itself or the substance of the information provided on it. Such URLs are called "descriptive" URLs. The BIDMC Website was configured to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communications made through a particular page on BIDMC's website. For example, the BIDMC Website has a page specifically about the BIDMC Cancer Center; that page's URL is https://www.bidmc.org/centers-and-departments/cancer-center. That is, one can tell from the URL itself the substance of the communication between BIDMC and the healthcare consumer—that the consumer is requesting information about cancer treatment.

49. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. As described below, Google Analytics and Meta Pixel are not themselves cookies but are instead implemented by JavaScript code. Both Google Analytics and Meta

Pixel continue to intercept communications even if a user has set their browser settings to turn off cookies.

50. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

51. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, BIDMC) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

52. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

53. When the JavaScript code causes the user's web browser to retrieve a file from the third party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.bidmc.org/); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the

website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

54. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third party such as Google and Facebook can then add the content of the user's communications with BIDMC to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

55. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

56. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and BIDMC contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

57. The use of tracking technologies became an important news story in June 2022 following a report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[3] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[4] In reaction to the Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or significantly limited its use.

58. BIDMC appears to be among these websites that removed Meta Pixel in reaction to the Markup Article. Based on an archived version of the BIDMC website's main page, it appears BIDMC removed Meta Pixel from its website in approximately late September 2022, a few months after the Markup Article was published. After it was sued, BIDMC also appears to have limited its use of Google Analytics and other third-party tracking technologies on its website. In any event, the tracking technologies BIDMC used are each substantially similar, both in their surreptitious deployment on the website and their contemporaneous interception of website users' communications with BIDMC.

---

[3] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[4] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

**BIDMC's Use of Tracking Technologies on the BIDMC Website**

59. BIDMC used various tracking technologies across the BIDMC Website. Several tracking technologies were injected into the code of all or almost all of the BIDMC Website pages. For example, on nearly every page of the BIDMC Website, BIDMC injected hidden code that loaded Google Analytics. It appears BIDMC injected Meta onto most pages on the BIDMC website before BIDMC removed Meta Pixel in late September 2022. It also appears that BIDMC may have limited its use of Google Analytics on the BIDMC Website around the time of the filing of the original complaint in this action. The examples provided below of BIDMC's deployment of Google Analytics on the BIDMC Website reflected such deployment around the time of the original complaint in this action. BIDMC controls when and how it uses Google Analytics and other tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect BIDMC's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

60. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

61. Below is an image of the main landing page for the BIDMC Website:




62. When a user loads the main landing page for the BIDMC Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

63. The image below depicts the landing page for the BIDMC Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




64. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:




65. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the BIDMC Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.bidmc.org"); and

(b) The title of the webpage (after the letters "dt," which includes "Beth Israel Deaconess Medical Center | BIDMC of Boston").

66. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual

across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, BIDMC).

67. Notably, when the website user's web browser intercepts the contents of communications between the website user and the BIDMC Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with BIDMC with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

68. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the BIDMC Website are the same.

69. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[5] Browser fingerprints are also considered personal identifiers, and tracking pixels can collect browser fingerprints from website visitors. Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

[5] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

70. As noted, BIDMC removed Meta Pixel from its website around September 2022, likely in response to press coverage and Congressional scrutiny following the Markup Article. An archived version of the main page of the BIDMC website, saved before BIDMC removed Meta Pixel, confirms that BIDMC used Meta Pixel code on the main landing page of its website as recently as late September 2022.

71. When BIDMC used Meta Pixel, the BIDMC Website would load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the BIDMC Website. Below is an example of the contents of the communication between the website user and BIDMC, which the hidden Meta Pixel would intercept and transmit to Facebook:

× Headers Payload Preview Response Initiator »

▾ Query String Parameters view source view URL-encoded

id: 1902404530083541
ev: Microdata
dl: https://www.bidmc.org/
rl:
if: false
ts: 1597209786020
cd[DataLayer]: []
cd[Meta]: {"title":"Beth Israel Deaconess Medical Center | BIDMC of Boston","meta:description":"Beth Israel Deaconess Medical Center (BIDMC), a part of the Beth Israel Lahey Health system, is a world-class teaching hospital of Harvard Medical School.","meta:keywords":""}
cd[OpenGraph]: {"og:title":"Beth Israel Deaconess Medical Center | BIDMC of Boston","og:description":"Beth Israel Deaconess Medical Center (BIDMC), a part of the Beth Israel Lahey Health system, is a world-class teaching hospital of Harvard Medical School.","twitter:title":"Beth Israel Deaconess Medical Center | BIDMC of Boston","twitter:description":"Beth Israel Deaconess Medical Center (BIDMC), a part of the Beth Israel Lahey Health system, is a world-class teaching hospital of Harvard Medical School.","og:url":"https://www.bidmc.org/","og:site_name":"BIDMC of Boston"}
cd[Schema.org]: []
cd[JSON-LD]: []
sw: 1920
sh: 1080
v: 2.9.23
r: stable
ec: 1

72. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the BIDMC Website, including the URL of the webpage visited, the title of the webpage, and descriptions of contents of the webpage. The interception and transmission to Facebook also included information

about the user's browser configuration and various codes to associate the communications with BIDMC's advertising account with Facebook.

73. Also, the JavaScript code for Meta Pixel caused the user's web browser to reveal the user's IP address to Facebook. This identifier permitted Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook could then use the contents of communications between the website user and BIDMC to serve personalized advertising to the website user in the future.

74. Moreover, the transmission to Facebook of the user's browser configuration permitted Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

75. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user, which permitted Facebook to track that individual across the BIDMC Website and further confirm that individual's real-world identity.

76. BIDMC also implemented an optional feature of Google Analytics that closely tracked how a website user scrolls through and clicks different parts of a webpage. For example, a user scrolling down on the main landing page of the BIDMC website, the Google Analytics code that BIDMC injected into its website would contemporaneously intercept and transmit to Google the fact that the user had so scrolled. A capture of the information sent to Google is depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

v: 1
_v: j99
a: 459526355
t: event
ni: 1
_s: 1
dl: https://www.bidmc.org/
ul: en-us
de: UTF-8
dt: Beth Israel Deaconess Medical Center | BIDMC of Boston
sd: 24-bit
sr: 1920x1080
vp: 1244x979
je: 0
ec: scrolling
ea: 50%
el: https://www.bidmc.org/
_u: SCCACEABBAAAACAAI~
jid:
gjid:
cid: 994595417.1676504729
tid: UA-132719750-10
_gid: 1277677110.1676504729
gtm: 45He32f0n81PQ3GJJD
z: 1224510134

As shown above, the Google Analytics code intercepted the fact that the user was "scrolling" through the webpage and had scrolled through 50% of the page. That is, BIDMC aided Google in intercepting not only information concerning the particular webpages visited by each user but also each user's movements and clicks within a webpage. That information is valuable to Google because it provides information about the website user's level of engagement on the particular webpage, which can inform Google's commercial use of the information, such as whether to serve personalized advertising that relates to the content of the communications between the website user and BIDMC.

77. BIDMC configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the website, which in turn may reveal personal information about the healthcare consumer. The further

examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes. To maintain her medical privacy, Plaintiff does not describe in this complaint the specific pages she visited, but Plaintiff visited webpages within the categories of pages described below into which BIDMC embedded Meta Pixel, Google Analytics, and other tracking technologies. Her communications with BIDMC, including Private Information, were intercepted similarly to the illustrative examples set forth below.

78. The BIDMC Website contains hundreds of subpages for specific "Conditions & Treatments" and "Centers & Departments." All such pages included the tracking technologies described in this complaint.

79. For example, the BIDMC Website contains a page entitled "Obstetrics & Gynecology," designed to inform the website user about OB/GYN services BIDMC offers. A user, by visiting this webpage, reveals to BIDMC that the user has some interest in OB/GYN services (for example, the user may be pregnant or know someone who is). When the user communicates with BIDMC by visiting this particular webpage, BIDMC causes the secret interception and transmission of that communication to Google and other third parties. Below is a screenshot of the Obstetrics & Gynecology webpage:




80. The graphic below presents the contents of the communication between the website user and BIDMC that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics JavaScript code that BIDMC secretly injects into the website (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▼ **Query String Parameters** view source view URL-encoded


v: 1
_v: j99
a: 582188403
t: event
ni: 1
_s: 1
dl: https://www.bidmc.org/centers-and-departments/obstetrics-and-gynecology
ul: en-us
de: UTF-8
dt: Obstetrics and Gynecology | BIDMC of Boston
sd: 24-bit
sr: 1920x1080
vp: 1244x979
je: 0
ec: scrolling
ea: 25%
el: https://www.bidmc.org/centers-and-departments/obstetrics-and-gynecology
_u: SCCACEABBAAAACAAI~
jid:
gjid:
cid: 596125675.1676646054
tid: UA-132719750-10
_gid: 821071908.1676646054
gtm: 45He32f0n81PQ3GJJD
z: 1850750301


81. As reflected in the above screenshot, the code injected into the BIDMC Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting an "Obstetrics and Gynecology" webpage on the BIDMC Website—

information that Google retains and can use for its own commercial purposes, and because Google retains it, can be accessible by third parties by subpoena or otherwise.[6]

82. Before BIDMC removed Meta Pixel from the BIDMC Website in or around late September 2022, the same webpage contained hidden code that intercepted the user's communication with the website and retransmitted that same information to Facebook. BIDMC caused the secret interception and transmission to Facebook of the contents of the communication between the website user and BIDMC, including that the user is visiting an "Obstetrics & Gynecology" webpage, information that Facebook retained and can use for commercial purposes.

83. The BIDMC Website contains hundreds of similar pages on particular medical specialties and practices that BIDMC offers. For each such page, the BIDMC Website aided Google and Facebook's secret interception of the contents of communications with BIDMC, similar to the above Obstetrics & Gynecology department example.

84. As reflected in the screenshot from the Obstetrics & Gynecology webpage, BIDMC pages on particular departments and centers each include a "Request an Appointment" button, through which the website user can request an appointment with a doctor in that specific department. When a user clicks on the "Request an Appointment" button, that click is intercepted and transmitted to Google. The screenshot below depicts the information intercepted and sent to Google when the user clicks the button:

[6] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.




As reflected in the above screenshot, hidden Google Analytics code intercepts and transmits to Google the fact that the user has made an "appointment click" to "request an appointment" in the "Obstetrics and Gynecology" department. This intercepted communication reveals an individual's likely status as a BIDMC patient. Google can then use the content of that intercepted communication for its own commercial purposes.

85. When a user clicks the "Request an Appointment" button, either from a department page or from the right-hand menu visible on almost all pages of the BIDMC Website, the user is taken to a form for the website user to fill out to request an appointment. A screenshot of part of the "Request an Appointment" page is set forth below:




86. As depicted in the above screenshot, the user can select the "Department" in which the user wishes to request an appointment. When a user makes a selection indicating the department in which the user wishes to request an appointment, that selection is intercepted and transmitted to

Google via the hidden Google Analytics code. A screenshot of the information intercepted and transmitted to Google is below[7]:




As reflected in the above example, hidden Google Analytics code intercepts and communicates to Google that the website user is filling out a "New Patient Appointment Request Form" and is seeking an "OB/GYN" doctor—information that Google retains and can use for its own commercial

[7] This is an example and does not reflect Plaintiff's personal activity on the website.

purposes, including associating those communications with the individual's real-world identity for targeted advertising purposes. This intercepted communication reveals an individual's likely status as a BIDMC patient. The same saved information can be accessed by third parties by a subpoena or otherwise.

87. Analysis of the underlying code of and network activity generated by historical, archived versions of the BIDMC Website's "Request an Appointment" page confirms that prior to late September 2022, BIDMC injected hidden Meta Pixel code on the Request an Appointment page during the class period, which intercepted and transmitted to Facebook contents of the communications between the website user and BIDMC. An example of the contents of communications intercepted and transmitted to Facebook is shown below (with highlighting added):

▼ Query String Parameters view source view URL-encoded
id: 1902404530083541
ev: Microdata
dl: https://www.bidmc.org/request-an-appointment
rl:
if: false
ts: 1597342065583
cd[DataLayer]: []
cd[Meta]: {"title":"Request An Appointment | BIDMC of Boston","meta:description":"If you are a new BIDMC patient, fill out the ","meta:keywords":""}
cd[OpenGraph]: {"og:title":"Request An Appointment | BIDMC of Boston","og:description":"If you are a new BIDMC patient, fill out the ","twitter:title":"Request An Appointment | BIDMC of Boston","twitter:description":"If you are a new BIDMC patient, fill out the ","og:url":"https://www.bidmc.org/request-an-appointment"}
cd[Schema.org]: []
cd[JSON-LD]: []
sw: 1920
sh: 1080
v: 2.9.23
r: stable
ec: 1
o: 30
fbp: fb.0.1597342065058.71904984
it: 1597342063937
coo: false
es: automatic
tm: 3
rqm: GET

88. Facebook could then use the intercepted communications (including the knowledge that a particular individual was requesting an appointment) for its own commercial purposes, including targeted advertising to that individual on Facebook-owned platforms. This intercepted communication reveals an individual's likely status as a BIDMC patient.

89. If a user completes the "Request an Appointment" form and clicks "Submit," that communication, too, is intercepted by hidden Google Analytics code and transmitted to Google, as reflected in the screenshot below (with highlighting added), which depicts a communication to Google that there has been a "submission" of the "request appointment…form."




This intercepted communication described above reveals an individual's likely status as a BIDMC patient.

90. The BIDMC Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by BIDMC. When an individual uses the search function, BIDMC aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "pregnant."[8]




[8] This is an example and does not reflect Plaintiff's personal activity on the website.

91. When a user performs this search on the BIDMC Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's search terms and transmit them to Google. Below is the portion of the communication that the Google Analytics code causes to be transmitted to Google (with highlighting added):




92. As reflected in the above screenshot, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google, which Google

can then use for its own commercial purposes, including associating those search terms with the individual's real-world identity for targeted advertising purposes.

93. Upon information and belief, before the removal of Meta Pixel from the BIDMC in late September 2022, healthcare consumers' searches on the BIDMC Website were similarly intercepted and transmitted to Facebook through the hidden Meta Pixel code.

94. The BIDMC Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. For example, the screenshot below depicts the search results page when a user indicates she is looking for a female doctor in "Obstetrics & Gynecology" within five miles of Boston zip code 02210[9]:

[9] This is an example and does not reflect Plaintiff's personal activity on the website.




95. Depicted below are the contents of the user's communication with the BIDMC website that are intercepted and transmitted to Google via hidden Google Analytics Code (with highlighting added):

```
× Headers Payload Preview Response Initiator Timing
▼ Query String Parameters    view source    view URL-encoded
v: 1
_v: j99
a: 1668524106
t: event
ni: 1
_s: 1
dl: https://findadoc.bidmc.org/?Gender=Female&Specialties=124&
sortby=distance&sortDirection=asc&address=Boston%2C+MA+02210%
2C+USA&distance=5&latlng=42.352%2C-71.041
ul: en-us
de: UTF-8
dt: Search Results - Beth Israel Deaconess
sd: 24-bit
sr: 1920x1080
vp: 1244x979
je: 0
ec: scrolling
ea: 25%
el: https://findadoc.bidmc.org/?Gender=Female&Specialties=124&
sortby=distance&sortDirection=asc&address=Boston%2C+MA+02210%
2C+USA&distance=5&latlng=42.352%2C-71.041
_u: SCCACEABBAAAAGAAI~
jid:
gjid:
cid: 596125675.1676646054
tid: UA-132719750-10
_gid: 821071908.1676646054
gtm: 45He32f0n81MQZPXRH
z: 911478634
```

96. The above screenshot reflects that when an individual enters a search on the BIDMC "Find a Doctor" page and chooses other filtering criteria, Google Analytics intercepts the contents of the search and transmits them to Google, including the other filtering criteria the user has selected, including a location within 5 miles of 02210 and a female doctor in the above example. Although the

"Specialties" criterion is represented by a numeric code ("124"), the meaning of that code is easily discernible by loading the full URL captured in the above screenshot. This intercepted communication also reveals an individual's likely status as a BIDMC patient. Google retains all this information and may use it for its own commercial purposes, including associating find-a-doctor search criteria with the individual's real-world identity for targeted advertising purposes.

97. Upon information and belief, before BIDMC removed Meta Pixel from the BIDMC Website in or around late September 2022, searches using the Find-A-Doctor function were likewise intercepted and transmitted to Facebook via hidden Meta Pixel code. Facebook could then associate the precise "Find a Doctor" search criteria selected by a user with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram).

98. The BIDMC website also provides information about two urgent care facilities operated by affiliates of BIDMC—one in Chelsea and one in Chestnut Hill (a BIDMC affiliate also previously operated an urgent care facility in Dedham). From the information pages on those two urgent care facilities, BIDMC provides an option to "Reserve your spot" in line at the urgent care. Part of the webpage through which a user may reserve their spot is depicted below:




99. When a user clicks on the "Reserve my spot" button, indicating the user's intent to obtain healthcare services from BIDMC's affiliated urgent care facilities, that communication is contemporaneously intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication intercepted and transmitted to Google are depicted below:




100. As reflected in the above screenshot, BIDMC facilitates Google's interception of the communication between a website user and BIDMC through which the user clicks on an "external link" to "Reserve my spot" at "Beth Israel Lahey Urgent Care – Chestnut Hill." This intercepted communication reveals an individual's likely status as a BIDMC patient. Google retains this

intercepted communication and may use it for its own commercial purposes, including associating those communications with the individual's real-world identity for targeted advertising purposes.

101. Analysis of the underlying code of and network activity generated by an archived version of the same "Urgent Care" section of the BIDMC website confirms that prior to removing Meta Pixel from its website, BIDMC injected hidden Meta Pixel code onto this page of the website, permitting Facebook to intercept the contents of communications between the website user and BIDMC concerning urgent care facilities affiliated with BIDMC.

102. The BIDMC website also contains a section permitting patients to pay bills they received from BIDMC. The website contains a "Make a Payment" button, as reflected in the screenshot below:



103. When a user clicks the "Make a Payment" button (which signifies the fact that the user is an individual who has received medical services from BIDMC), that communication with BIDMC is intercepted and transmitted to Google. The contents of the communication that are intercepted and transmitted to Google are depicted below (with highlighting added):




104. As reflected in the above screenshot, hidden Google Analytics code intercepts that the user is visiting the "Billing and Financial Assistance" page and has clicked on an "external link" leading

to a "Make a Payment" website. This intercepted communication reveals an individual's likely status as a BIDMC patient. Google retains this intercepted communication and may use it for its own commercial purposes, including associating those communications with the individual's real-world identity for targeted advertising purposes.

105. Before removing the Meta Pixel code from its website in late September 2022, BIDMC also injected hidden Meta Pixel code into the above "Paying Your Hospital Bill" website, which, similar to Google Analytics, would intercept and transmit to Facebook not only the fact that the user was visiting that webpage but also the fact that the user clicks the "Make a Payment" button. Below is a depiction of the information that the hidden Meta Pixel code would intercept and transmit to Facebook upon clicking the "Make a Payment" button:

× Headers Payload Preview Response Initiator Timing »

▾ **Query String Parameters** view source view URL-encoded

id: 1902404530083541
ev: SubscribedButtonClick
dl: https://www.bidmc.org/patient-and-visitor-information/patient-information/your-hospital-bill
rl:
if: false
ts: 1597339254430
cd[buttonFeatures]: {"classList":"button","destination":"https://www.mymedpayment.com/bidmc/","id":"","imageUrl":"","innerText":"Make a Payment","numChildButtons":0,"tag":"a","name":""}
cd[buttonText]: Make a Payment
cd[formFeatures]: []
cd[pageFeatures]: {"title":"Your Hospital Bill (Pay Your Bill Online) | BIDMC of Boston"}
cd[parameters]: []
sw: 1920
sh: 1080
v: 2.9.23
r: stable
ec: 2
o: 30
fbp: fb.0.1597339216046.1981939244
it: 1597339214480
coo: false
es: automatic
tm: 3
rqm: GET

106. As reflected above, the hidden Meta Pixel would intercept and transmit to Facebook that the user has clicked a "Make a Payment" button on a "Your Hospital Bill" webpage on the BIDMC website. This intercepted communication also reveals an individual's likely status as a BIDMC patient. Facebook then retains and uses that intercepted communication for its own commercial purposes.

107. The BIDMC Website also contains a feature that permits website users who are patients at BIDMC to access their medical records and other personal information, called PatientSite. The screenshot below depicts a button that links to the PatientSite:




108. If a user clicks on the "PatientSite Login" button, that communication is intercepted and transmitted to Google. The contents of that communication that are intercepted and transmitted to Google are depicted below:




109. As reflected in the above screenshot, hidden Google Analytics code causes the interception and transmission to Google of the fact that the website user, from a BIDMC webpage, has clicked on an "external link" that takes them to the "PatientSite Login." This intercepted communication reveals an individual's likely status as a BIDMC patient. Google retains this intercepted communication and may use it for its own commercial purposes, including associating the user's communications with the individual's real-world identity for targeted advertising purposes.

110. In addition to Google and Facebook, BIDMC enabled the communications between healthcare consumers and BIDMC to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Doubleclick.** Google Doubleclick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, BIDMC inserted code into their website that causes communications between the user and the website to be intercepted by and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(b) **Siteimprove Analytics.** Siteimprove Analytics is a service similar to Google Analytics. It markets itself as providing "powerful insights into visitor behavior and website performance with intuitive dashboards and easy-to-use reporting, so you can make data-driven decisions to consistently deliver business results across teams." Siteimprove functions similarly to Google Analytics in using hidden code to secretly intercept and transmit to Siteimprove the contents of website users' communications with BIDMC through the BIDMC website, including the URL of each page visited.

(c) **Marchex.io.** Marchex.io is known primarily for its call analytics but also offers website tracking. During the class period, BIDMC inserted Marchex.io pixels that analyzed activity on the BIDMC Website. Marchex operates through hidden code that intercepts communications between website users and BIDMC, including the identity of the user visiting the website, which is revealed through the user's IP address.

**<u>The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary</u>**

111. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the BIDMC Website's operation. The BIDMC Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

112. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can contain links to its Facebook profile or invite website users to interact with BIDMC via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook profile; any website can have one without the other.

113. Moreover, even if BIDMC wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for BIDMC (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that BIDMC does not share the communications with others when it does; or (iii) to claim that BIDMC maintains the privacy of those communications when it does not.

**BIDMC Violated HIPAA and the FTC Act.**

114. Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[10]

115. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or the Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

116. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

117. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this

[10] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[11]

118. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"'; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

119. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

120. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

---

[11] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

121. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service," including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

122. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[12]

123. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[13]

124. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without

[12] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.11.
[13] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[14]

125. In other words, the HHS has expressly stated that entities like BIDMC that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

126. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

127. Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals like BIDMC's PatientSite that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)…relates to the individual's past, present, or future health or health care or payment for care."

128. The HHS Bulletin went on to state:

---

[14] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added).

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

129. BIDMC's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

130. BIDMC is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

131. BIDMC's use of tracking technologies violated the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties without their authorization.

132. BIDMC improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, and (c) patients' status as patients of BIDMC by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, bill payment pages, medical records access, and the login page for the PatientSite patient portal).

133. For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on doctors, conditions, and medical procedures, and her access to the BIDMC PatientSite patient portal, BIDMC permitted third parties to intercept the identity of doctors for Plaintiff and her husband, "specific symptoms or health conditions" connected to Plaintiff and her husband, and patient status, each of which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

134. BIDMC improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and

others to identify the individual. BIDMC disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

135. BIDMC violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

136. BIDMC further violated other HIPAA regulations as follows:

(a) BIDMC failed to ensure the confidentiality and integrity of electronic PHI that BIDMC created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(b) BIDMC failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(c) BIDMC failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to BIDMC in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(d) BIDMC failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(e) BIDMC failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(f) BIDMC failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

137. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the

hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[15]

138. BIDMC's undisclosed use of tracking technologies on their website violated Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of action, BIDMC's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

139. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."[16]

140. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

[15] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

[16] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

141. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

142. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[17]

143. Last year, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[18]

**<u>BIDMC Violated Industry Standards</u>**

144. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

---

[17] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[18] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

145. The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

146. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

147. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

148. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[19]

149. BIDMC, through the conduct described in this complaint, violated the AMA Code of Medical Ethics by gathering and recording information about patients that BIDMC failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

[19] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

**Plaintiff and Class Members Suffered Harm from BIDMC's Unlawful Interceptions and Disclosures of Plaintiff's and Class Member's Private Information**

150. As a direct and proximate cause of BIDMC's unauthorized interceptions and disclosures of Plaintiff's and Class Member's Private Information, Plaintiff and Class Members have been damaged by BIDMC's conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c) BIDMC denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used BIDMC's services or would have demanded compensation for BIDMC's use of their Private Information if they had known of BIDMC's practices;

(d) BIDMC eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Member's rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) BIDMC took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) BIDMC's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

**Class Action Allegations**

151. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.bidmc.org between three years prior to the date of the filing of the initial complaint in this action and the date BIDMC

removed from the BIDMC Website the tracking technologies described in the complaint.[20]

152. This action is properly maintainable as a class action.

153. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

154. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and BIDMC, through the BIDMC Website, were electronic communications under the ECPA;

(b) Whether BIDMC inserted tracking technologies into the hidden code of the BIDMC Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the BIDMC Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between BIDMC and users of the BIDMC Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, BIDMC installed an electronic device on their website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and BIDMC;

(g) Whether and to what extent BIDMC had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h) Whether BIDMC had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

[20] This precise date will be determined through discovery.

(i) Whether the terms of BIDMC's privacy policy either were or formed part of a contract between BIDMC and Plaintiff and Class Members;

(j) Whether BIDMC's disclosure of Plaintiff's and Class Members' IHII and PHI breached BIDMC's promises set forth in its privacy policy, giving rise to liability for breach of contract;

(k) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of actions to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

155. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the BIDMC Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

156. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

157. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

158. BIDMC has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

**(Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)**

159. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

160. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

161. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and BIDMC, through the BIDMC Website, were electronic communications under the ECPA.

162. The tracking technologies inserted into the hidden code of the BIDMC Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the BIDMC Website; (ii) Class Members' web browsers used to access the BIDMC Website; (iii) BIDMC's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the BIDMC Website.

163. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between BIDMC and users of the BIDMC Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

164. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, BIDMC

configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and BIDMC, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and BIDMC), permitting the interception of the substance of requests for information on particular doctors, permitting the interception of the substance of search terms inputted by healthcare consumers, and using tracking technologies on pages that would confirm to third parties such as Google and Facebook the healthcare consumers' likely status as BIDMC patients.

165. With respect to Plaintiff, the tracking technologies revealed information regarding the doctors, conditions, and symptoms for Plaintiff and her husband, and Plaintiff's status as a patient (or more specifically, Plaintiff's husband's status) by configuring the tracking technologies to reveal the substance of communications regarding doctors, conditions and symptoms, and by putting the tracking technologies on the login page for its PatientSite patient portal, a portion of the BIDMC Website specifically designed for patients.

166. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, BIDMC intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

167. Additionally, through the above-described tracking technologies, after BIDMC intercepted communications, the intercepted information was, in turn, used by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

168. BIDMC facilitated the interception of communications between the Class Members and BIDMC, and BIDMC disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

169. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

170. BIDMC intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint.

171. Because of BIDMC's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information, Defendant does not qualify for the party exemption.

172. As alleged above, BIDMC violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

173. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

174. Plaintiff's Private Information that BIDMC disclosed to third parties qualifies as IIHI, and BIDMC violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal

conduct by violating 42 U.S.C. § 1320d(6). BIDMC used the intercepted electronic communications to increase its revenues.

175. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. BIDMC specifically used tracking technologies to intercept and disclose Plaintiff's and Class Members' Private Information for financial gain.

176. BIDMC's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

177. BIDMC's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because BIDMC's use of the Facebook source code was for BIDMC's commercial advantage to increase revenue from existing patients and gain new patients.

178. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

179. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of BIDMC's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

**COUNT II**

**(Violation of the Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, on behalf of the Class)**

180. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

181. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

182. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

183. BIDMC had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

184. Plaintiff and Class Members did not authorize Defendant to disclose their IHII to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment.

185. BIDMC distributed Plaintiff and Class Members' Private Information to unauthorized third parties to market its services and increase profits, and those third parties can and did provide or permit the use of the same information to numerous other third parties (including advertisers and data brokers), and therefore, BIDMC's conduct reflected a public disclosure of private facts.

186. Additionally, BIDMC's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Member's private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive.

187. BIDMC's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

188. Plaintiff and Class Members suffered injuries as a direct and proximate result of BIDMC's disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

189. BIDMC's acts or omissions violate the Massachusetts Right to Privacy Act.

190. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 150, *supra*), plus costs and attorneys' fees.

**COUNT III**

**(Breach of Fiduciary Duty, on behalf of the Class)**

191. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

192. A fiduciary relationship existed between BIDMC, a healthcare provider, and Plaintiff and her husband, a BIDMC patient and his spouse. Furthermore, BIDMC assumed the role of a fiduciary by undertaking to collect the Private Information of Plaintiff and her husband.

193. When possessing nonpublic medical information, medical providers such as BIDMC have a duty to keep such information completely confidential.

194. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to BIDMC through its website, which included highly sensitive Private Information. BIDMC's policies bolstered that expectation, given BIDMC's promises to Plaintiff that BIDMC would not disclose communications on the website to third parties.

195. Contrary to its duties as a healthcare provider and its express promises of confidentiality, BIDMC installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' Private Information, including information relating to the healthcare of Plaintiff's husband.

196. These disclosures were made without Plaintiff's knowledge, consent, or authorization.

197. BIDMC's secret and unauthorized disclosures of Plaintiff's Private Information constituted a breach of BIDMC's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

198. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 150, *supra*).

**COUNT IV**

**(Negligence, on behalf of the Class)**

199. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

200. Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, BIDMC owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

201. BIDMC breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

202. It was reasonably foreseeable that BIDMC's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through their tracking

technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

203. BIDMC's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship between BIDMC and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

204. In addition, BIDMC had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

205. BIDMC's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

206. BIDMC's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted negligence at common law.

207. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 150, *supra*), plus costs and attorneys' fees.

**COUNT V**

**(Breach of Confidence, on behalf of the Class)**

208. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

209. Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

210. Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

211. When possessing nonpublic medical information, medical providers such as BIDMC have a duty to keep such information completely confidential.

212. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to BIDMC through its website, which included highly sensitive Private Information. BIDMC's policies bolstered that expectation, given BIDMC's promises to Plaintiff that BIDMC would not disclose communications on the website to third parties.

213. In light of the special relationship between BIDMC and Plaintiff and Class Members, whereby BIDMC became a guardian of Plaintiff's and Class Members' Private Information, BIDMC became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) BIDMC did and does store and disclose.

214. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, BIDMC installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with BIDMC and the contents of those communications, including Private Information.

215. BIDMC made these disclosures for its own commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization.

216. The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by BIDMC's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of BIDMC's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

217. BIDMC disclosed Plaintiff's and Class Members' Private Information to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

218. The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

219. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 150, *supra*), plus costs and attorneys' fees.

**<u>COUNT VI</u>**

**(Breach of Contract, on behalf of the Class)**

220. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

221. BIDMC required Plaintiff and Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the BIDMC Website as a condition of receiving healthcare services. Plaintiff's and Class Member's provision of such Private Information provided consideration for BIDMC's provision of services through the BIDMC Website, including the provision of information and the use of the website to obtain medical services.

222. In so doing, Plaintiff and Class Members entered into express contracts with BIDMC (or, in the alternative, implied contracts) by which BIDMC agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. BIDMC's contractual promises included that (i) any data Plaintiff and Class Members provided through their communications on the BIDMC Website would be collected only on an "aggregate, anonymous basis, which means no personally identifiable information [would be] associated with the data"; (ii) "[e]xcept for authorized law enforcement investigations or other facially valid legal processes, we will not share any information we receive with any outside parties"; and (iii) website server data would be used only to "prevent security breaches and…ensure the integrity of the data on our servers," thus excluding from their contractual authority any ability to use information on website communications for third-party marketing purposes.

223. Plaintiff and Class Members fully performed their obligations under the contract with BIDMC.

224. BIDMC breached its agreement with Plaintiff and Class Members by directly breaching its promises to collect information only on an aggregate, anonymous basis, not to share information regarding website communications "with any outside parties," and to use information on website communications only to prevent security breaches and ensure data integrity.

225. As a direct and proximate result of BIDMC's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private Information and have been denied the benefit of the bargain of their agreement with BIDMC.

226. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 150, *supra,* plus costs and attorneys' fees.

## COUNT VII

**(Unjust Enrichment, on behalf of the Class)**

227. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

228. This claim is pleaded in the alternative to Plaintiff's other causes of action.

229. BIDMC benefits from using Plaintiff's and Class Members' Private Information and unjustly retained those benefits at Plaintiff's and Class Members' expense.

230. Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

231. BIDMC consciously collected and used this information for its own gain, providing BIDMC with economic, intangible, and other benefits, including substantial monetary compensation.

232. BIDMC unjustly retained those benefits at the expense of Plaintiff and Class Members because BIDMC's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

233. The benefits that BIDMC derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for BIDMC to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

234. Had BIDMC informed Plaintiff that it collected and shared Plaintiff's Private Information with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of BIDMC's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

235. The Court should compel BIDMC to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that BIDMC unjustly received and such other relief as the Court may deem just and proper.

**Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23 and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

## **Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 9, 2024

Respectfully submitted,

*/s/ Patrick J. Vallely*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on December 9, 2024

*/s/ Patrick J. Vallely*
Patrick J. Vallely